Tallulah **MORGAN** et al., Plaintiffs,

v.

John J. **KERRIGAN** et al., Defendants.

Civ. A. No. 72–911–G.

United States District Court,
D. Massachusetts.

June 5, 1975.

Robert Pressman, Eric E. Van Loon, Center for Law and Education, Cambridge, Mass., John Leubsdorf, Foley, Hoag, and Eliot, Boston, Mass., J. Harold Flannery, Washington, D. C., Rudolph F. Pierce, Boston, Mass., and Nathaniel R. Jones, New York City, for plaintiffs.

James Sullivan, Philip Tierney, Matthew Connolly, DiMento & Sullivan, Boston, Mass., for defendants School Committee.

Richard W. Coleman, Segal, Roitman & Coleman, Boston, Mass., for School Administration.

Sandra Lynch, State Board of Ed., Boston, Mass., for State Bd. of Ed.

Thayer Fremont-Smith, Choate, Hall & Stewart, Boston, Mass., for Boston Home and School Assn.

Timothy Wise, Asst. Atty. Gen., Boston, Mass., for Comm. of Massachusetts.

Kevin F. Moloney, City of Boston Law Dept., Boston, Mass., for City of Boston & Mayor White.

John F. McMahon, Angoff, Goldman, Manning, Pyle & Wanger, Boston, Mass., for Boston Teachers Union.

Jeanne Mirer, Kathleen Weremuik Segal, Mass. Chapter of National Lawyers Guild, Boston, Mass., Jack John Olivero, Richard J. Hiller, Herbert Teitelbaum, Puerto Rican Legal Defense and Education Fund, Inc., New York City, for El Comite.

MEMORANDUM OF DECISION
AND
REMEDIAL ORDERS

Table of Contents

I Introduction ......................................... 222
II Prior Proceedings ................................... 224
III Findings and Conclusions ........................... 227
 A. Plans submitted by the Parties ..................... 228
 B. General Principles Governing Remedy ................ 229
 C. School Districts ................................... 235
 D. Guidelines for Assigning Students .................. 240
 E. Examination Schools ............................... 242
 F. School Closings and Capacities ..................... 245
 G. Magnet Schools and Programs ....................... 246
 H. Citizen Participation, Monitoring, Reporting .......... 248
IV Conclusion .......................................... 249
V Student Desegregation Plan (excerpts from) ............. 250
 A. The Community School Districts ..................... 250
 B. The Citywide School District ....................... 256
 C. Vocational Education (omitted) ..................... ——
 D. Guidelines for Assigning Students .................. 261
 E. Transportation .................................... 263
 F. Cost Considerations ............................... 264
 G. Citizen Participation, Monitoring and Reporting ....... 265
 H. Timetable for Implementation ...................... 269
 I. Further Remedial Orders (omitted) .................. ——
 J. Retention of Jurisdiction (omitted) ................. ——
VI Appendices (omitted) ................................ ——

GARRITY, District Judge.

### Introduction [1]

Boston has been a magnet for people searching for access to the larger American society ever since the founding of the nation. Boston's magnetism has, in recent decades, attracted thousands of black Americans, Hispanic Americans, and Oriental Americans into its midst. Like those who preceded them from Europe, these Americans are being pushed by the hardships of their present life and pulled by the promise of opportunities that Boston has always represented.

Many Bostonians today face a different situation from the one faced by settlers in earlier generations, however. Many of today's Bostonians, white, black, and other minorities, must bridge a cultural gap far wider than the one bridged by their predecessors.

Hard as the bridge to opportunity was to travel for most Bostonians from 1800 to 1946, the bridge did exist. Growing industries were in search of workers. The physical structure of Boston permitted the incoming ethnic groups, albeit after much struggle, to settle in enclaves within a city that was not yet overbuilt. Of equal importance, free public schools served as an open road across the gulf between the old cultures and the new. Public schools also provided,

1. This introduction has been taken almost verbatim from the report of the masters filed March 31, 1975.

through their instruction, access to semi-skilled and skilled occupations.

Building upon a foundation laid in the colonial era, Boston became the bridge not only to liberty, but to the ideal of the free, universal, and inclusive public school. Horace Mann established in 1837 the nation's first statewide education commission. In that decade, he achieved world wide renown as the Father of the Common School. Under his stimulus, Boston erected the Quincy School, still in use today in Boston, as the nation's first multi-classroom public elementary school. Built in 1847, the Quincy School expressed in brick and mortar as well as program all that was ideal, urban, and progressive in the nineteenth century vision of the Common School.

Horace Mann's vision served the children and youth of Boston for more than a century. But, as the deterioration and segregation of the Quincy School make plain to the eye of any visitor, that vision began to dim after World War II. Public schools and school services became increasingly unequal in quality. Some became exclusive rather than inclusive of all groups.

Ethnic segregation, cultural isolation, overcrowding some schools and extreme underutilization in others, incoherent grade structures, discriminatory assignments and school admissions procedures, all combined to guarantee unequal and inferior educational opportunities for the children of Boston. By the late 1960's conditions had become so deplorable that one responsible investigator reported,

> Of any generation of seventh graders, 85 percent *do not* complete four years of college; 75 percent do not even begin college. In any ghetto area, more than half never finish high school.[2]

As the public schools of Boston declined, they also became outmoded. Speaking of them, the Harrington Report concluded, "Course offerings available to most public school students today are similar to those in the schools of their parents and grandparents."[3] In the last few years, the Boston School Department has worked to introduce some innovations and improvements, but these have been handicapped by maneuvers to maintain segregation.

This demise over a period of three decades took place alongside the rising hunger of Bostonians for schools that could help them bridge the gap between ethnic isolation and access to the larger and ever more complex urban society. The children of second and third generation white ethnic families suffered as the schools located within their residential enclaves came to reinforce rather than reduce the educational distance between their neighborhood and access to the larger society. Black and other minority children, meanwhile, suffered even greater educational deprivations as the schools they attended were the most crowded, the oldest, the least well maintained, and the most poorly staffed that the school committee could offer.

In the court's quest for a remedy adequate to reviving the vision of an equitable and effective public school system, it has planned for schools that will be free, universal, inclusive, and sound in ways that meet the educational needs and aspirations of all of Boston's citizens. It believes that the reconstruction of the ideal of the Common School requires a common concern with equality and excellence throughout all institutions and groups in the entire Greater Boston area.

While it has obligated the Boston School Committee and its Department to eliminate segregation and the effects of discrimination in the public schools, it has also solicited the talent, support, and assistance of colleges, universities, and business and other organizations in de-

---

2. Peter Schrag, *Village School Downtown*, (1967).

3. Willis—Harrington Commission.

veloping learning opportunities that will remedy the losses students have already suffered and that will lay a basis for improving the quality of education for the total City.

## II

### Prior Proceedings

On June 21, 1974 the court issued an opinion holding that Boston's public schools had been unconstitutionally segregated by the purposeful actions of the school committee and superintendent. *Morgan v. Hennigan,* D.Mass.1974, 379 F.Supp. 410. This finding was affirmed by the Court of Appeals in December of 1974. *Morgan v. Kerrigan,* 1 Cir. 1974, 509 F.2d 580. The finding was based on a history of school committee actions and inactions spanning a decade, involving overcrowding and underutilization of facilities, placement of portable classrooms, use of new facilities, districting, feeder patterns, open enrollment policies, and hiring and assignment of faculty and staff, which intentionally brought about and maintained a dual school system in Boston. In 1971–72 the system contained 59,300 whites (61%) and 30,600 blacks (32%), yet only five of 140 elementary schools had a racial composition that came within 10% of the citywide ratio. Eight-four percent of white students in Boston attended schools more than 80% white; 62% of black students attended schools more than 70% black. 379 F.Supp. at 424. Added to the background of this case were efforts by the school committee beginning in 1965 to evade the effects of the Racial Imbalance Act passed by the Massachusetts legislature. Mass.G.L. c. 71, §§ 37C and 37D, and c. 15, §§ 1*I*, 1J and 1K. Following an unsuccessful attack by the Boston School Committee on the constitutionality of the statute, a series of orders of the State Board of Education and judicial proceedings in state courts culminated in orders from the Supreme Judicial Court that the school committee implement in the 1974–75 school year a plan formulated by the State Board of Education (the "state plan").

In the court's opinion of June 21, 1974 the defendants Boston School Committee and Superintendent (the "city defendants") were found to have "knowingly carried out a systematic program of segregation affecting all of the city's students, teachers and school facilities and have intentionally brought about and maintained a dual school system." 379 F.Supp. 410, 482. The court ordered these defendants to "begin forthwith the formulation and implementation of plans which shall eliminate every form of racial segregation in the public schools of Boston, including all consequences and vestiges of segregregation previously practiced by the defendants." 379 F. Supp. at 484. As an interlocutory order, the court enjoined the defendant school committee and superintendent from failing to comply with the state plan.

In July 1974 the school committee and superintendent, dissatisfied with the state plan, requested time in which to prepare a substitute plan which would accomplish desegregation in two stages, secondary schools in September 1974 and elementary schools in September 1975. The court granted time until July 29. At the end of this period, the defendants reported that they had been unable to develop a satisfactory substitute for the state plan, and the efforts of the court and parties turned to the implementation of the state plan. The state plan is only a partial plan in terms of the constitutional requirements of this case. Drawn under constraints of state law regarding assignments, it sought to decrease the number of racially imbalanced schools, i. e., having a majority of non-white students, from 68 to 44. It left large areas of the city such as Charlestown and East Boston unaffected and permitted the continuation of a number of virtually all black middle and elementary schools.

The opening of school under the state plan in September of 1974 was accompa-

nied by some violence and much fear. School buses were stoned, their windows broken and some children cut by shattered glass. Angry crowds of white parents and students gathered in front of schools to protest the entry of black students assigned there. Student boycotts of varying effectiveness were organized. Many students stayed home or were kept home by their parents out of fear for their personal safety. Several city high schools were the scenes of racially-connected fights and incidents. As the school year continued, violence subsided, then recurred. The court and the parties took several steps in an effort to provide security and reduce racial tensions. Racial-ethnic councils of parents and students were established. In October federal marshals were requested by the Mayor, but it developed that such assistance was available at the federal level only after city and state resources were exhausted. State troopers joined city police in large numbers in troubled areas, such as predominantly white South Boston and Hyde Park. Even today 166 state and local police officers are stationed in the halls of South Boston High School and another 134 are stationed in the vicinity during school hours. In December a white student was stabbed inside South Boston High School by a black student. Community residents gathered and surrounded the high school building, trapping black students inside until a decoy operation by police permitted the departure of the black students. In the aftermath of this incident, all schools in the South Boston-Roxbury district were closed early for the Christmas vacation and reopened late, and then only against advice of city and state police officials who urged the permanent closing of South Boston High. The court issued orders designed to keep crowds from gathering along bus routes and around school buildings, and to keep non-students out of school buildings during class hours. The student code of discipline was amended to prohibit the use of racial epithets to antagonize others. The parties developed alternative plans for students at South Boston High should its permanent closing have become necessary. A monitoring program was developed by the Community Relations Service of the United States Department of Justice, under which volunteers have been stationed in troubled schools to watch for signs of increasing tension.

In many schools this year the atmosphere has been one of felt tension, where the educational process has suffered. In others, notably at the middle and elementary school levels, but also at some high schools, students and teachers have gone about the business of learning and have developed integrated learning programs of which they are proud.

As these events were occurring, planning was renewed for the development of a citywide desegregation plan to be implemented in September 1975. After several hearings on proposals of the parties as to its terms, the court entered an order on October 31, 1974 establishing the filing date and general contents of a student desegregation plan to be filed by the defendants. This order required the filing of progress reports on the development of the plan and filing of the plan itself by December 16, 1974. It also stated that "the plan shall be approved by vote of the defendant school committee before submission to the court." In setting standards for the plan, the court said:

Taking into account the safety of students and the practicalities of the situation, the student desegregation plan shall provide for the greatest possible degree of actual desegregation of all grades in all schools in all parts of the city. In drafting the plan, the defendants shall utilize as a starting point and keep in mind the goal that the racial composition of the student body of every school should generally reflect the ratios of white and black students enrolled at that grade level of schools, elementary, intermediate and secondary, throughout the system.

The order provided that parties and other interested community groups would have until January 20, 1975 to file criticisms of the school committee plan or to file alternative plans.

Progress reports were duly filed by the defendants, but on the deadline for filing its plan, December 16, the school committee by a three to two vote refused to approve for filing with the court the plan developed by the school department at the school committee's direction and about which the progress reports had been made. Counsel for the defendants filed the plan (known as "the December 16 plan") despite the school committee vote, then asked the court's permission, granted when new counsel was later obtained, to withdraw from the case.

Plaintiffs filed motions that the three members of the school committee voting against submission of the December 16 plan be held in criminal and civil contempt. In preparation for the hearing on these motions, the court required written answers from these three school committee members to questions about their willingness to obey future orders of the court and their willingness to take affirmative steps to decrease racial tensions and peacefully implement the state plan. In every case the members stated that they would obey orders by the court but would take no other steps except where they deemed actions would reduce racial antagonism and provide adequate safety for the school children. The questions and the then chairman Kerrigan's answers, which were typical, appear as Appendix A. At hearing on the contempt motions the members testified that their votes had been based on conscientious opposition to any form of "forced busing," i. e., assignments to schools beyond walking distance, which made them unable to endorse any desegregation plan containing forced busing. This view was adhered to even though there might be no desegregation without mandatory busing. The then chairman Kerrigan testified as follows:

I certainly am against the forced busing of school children. I have always been against the forced busing of school children. I ran for office stating that I would never vote for a plan that involved the busing of school children. It is unfortunate that is the way our society exists, the way the housing patterns are laid out, but the only way you are going to desegregate city schools is through forced busing.

I certainly could go for magnet schools. I certainly could go for an increase in the METCO program. I could go for any plan that would give the parents whom I represent a choice of the school. I can't vote for a plan that includes the forced busing of school children. The hypocrisy in that statement is there is no way that it can be done without the forced busing of children.

The court denied the motions for criminal contempt but held the three committeemen in civil contempt of the October 31 order. In order to continue the planning process, however, the court directed the parties to file critiques and alternatives to the December 16 plan, unsponsored though it was. On December 30 the court outlined sanctions to begin January 9, 1975 which could be avoided or purged by a vote to authorize the submission of a student desegregation plan. On January 7, after applications for a stay of sanctions were denied by this court and by the Court of Appeals, the school committee voted to direct the school department to draw up a desegregation plan without forced busing and to authorize the submission to the court of that plan. The court found that the three committeemen had thereby purged themselves of civil contempt provided the plan was authorized and filed by January 20, later extended to January 27. The school committee did authorize and file a plan on January 27.

An alternative plan was filed on January 20 by the plaintiffs, along with criticisms of the December 16 plan by parties including the state defendants, the

Mayor and Public Facilities Department, the Boston Teachers Union, as well as numerous community groups and individuals. El Comite de Padres Pro Defensa de la Educacion Bilingue (hereinafter referred to as "El Comite") was permitted to intervene on behalf of the Hispanic children and parents and also filed comments on the various submissions. The parties then filed comments on each other's submissions to clarify points of disagreement.

The Home and School Association, comprising chapters of parents, was permitted to intervene on the question of the student desegregation remedy and filed a plan and supporting memoranda which the court treated as a motion to modify its October 31 order. The association attempted to show that certain segregated schools had not been affected by defendants' actions and therefore were not required to be desegregated in formulating a remedy. The association argued that even within an admittedly dual school system, the remedy should reach only those schools in the system as to which specific findings as to the effect of segregative actions had been made. The court held a separate hearing on February 5, rejected the association's motion and refused to allow further consideration of its plan.

The court determined that because of the complexity and multiplicity of the school desegregation plans and proposals filed, the use of a panel of masters to hold evidentiary hearings and make recommendations on a desegregation plan to the court was advisable. On January 31, the court appointed two experts, Dr. Robert A. Dentler, Dean of the Boston University School of Education, and Dr. Marvin B. Scott, Associate Dean of the same school, to assist the masters and the court in the task of adopting a student desegregation plan for September 1975.

In an order on February 7, the court formally appointed a panel of four masters (they had been designated on February 5 to allow parties to object to their identity and to terms of the proposed order of reference): retired Supreme Judicial Court Justice Jacob J. Spiegel, who presided at the hearings; former United States Commissioner of Education Francis Keppel; former state Attorney General Edward J. McCormack, Jr.; and Professor of Education at Harvard University Dr. Charles V. Willie. The masters held two weeks of evidentiary hearings, beginning February 10. On March 31, after having heard the parties' comments on their draft report, the masters filed their final report with the court which recommended a plan prepared by them incorporating elements of the plans submitted by the parties and proposals of their own. The parties then filed objections to the masters' report. After hearings on these objections, and on objections to modifications proposed by the court after examination by its experts of updated data furnished on April 10 by the school department, the court decided upon the modified version of the plan recommended by the masters which is established by the remedial orders herein promulgated.

### III

### *Findings and Conclusions*

The findings of fact and conclusions of law that follow constitute many but by no means all of the factual and legal underpinnings of the court's student desegregation plan and related remedial orders. Numerous findings descriptive of the Boston public school system, its facilities, student body, curriculum, administration and the like, appear in the plan itself. Also, the transcripts of several hearings in open court on the remedial aspects of the case contain many oral findings and rulings by the court which are pertinent. This memorandum of decision deals mainly with the reasons for particular features of the desegregation plan that have been of major concern to the parties.

## A.

*Plans Submitted by Parties*

The plan submitted by the school committee on January 27, 1975 was constitutionally inadequate because it did not promise realistically to desegregate the public schools. It proposed a phased assignment process based on choices by parents and students among a series of options. The assignment process would require a period of up to seven weeks and up to five communications between the school department and the individual parent or student who would be allowed but one week in which to respond to each communication. Magnet programs in citywide and zonal schools would be open on a desegregated basis only, but the ultimate composition of the majority of schools in a zone would be determined by parental choice. For schools which remained "racially isolated", defined by the school department as more than 15% beyond the racial ratio of the zone at that level, as a result of parent and student choices, the plan provided for mandatory participation of students at those schools at desegregated "third-site Resource Centers" one day a week for elementary schools and one day every two weeks for middle schools.

■ As pointed out by the masters, any plan that places complete reliance on parental choice to desegregate Boston's schools cannot be constitutionally adopted. Such plans must be rejected where, as here, there are more effective methods of desegregation reasonably available. *Green v. School Board of New Kent County*, 1968, 391 U.S. 430, 88 S. Ct. 1689, 20 L.Ed.2d 716. Complete freedom-of-choice plans have a long history of failing in many cases when adopted to result in desegregation. E. g., *Green v. School Board of New Kent County, supra; Monroe v. Board of Commissioners*, 1968, 391 U.S. 450, 88 S.Ct. 1700, 20 L.Ed.2d 733; *Hall v. St. Helena Parish School Bd.*, 5 Cir. 1969, 417 F.2d 801; *United States v. Jeffer-*

*son County Board of Education*, 5 Cir. 1969, 417 F.2d 834.

We need not rely on experience elsewhere, however, to predict the ineffectiveness of such a plan in Boston. Boston's own experience with open enrollments, feeder patterns and options, and the opening of the Hennigan and Lee schools, set out in detail in the court's June 21 opinion, *Morgan v. Hennigan, supra*, at 430–441–56, shows the segregative effects that have occurred under such options in Boston and which in all likelihood would occur again if the school committee plan were to be adopted.

Certainly there have been some magnet programs in Boston, such as the model demonstration subsystem elementary program at the Trotter School, that have achieved integrated enrollments through volunteer applications. To the extent that desegregation in Boston can be achieved on a voluntary basis, the court endorses the concept and incorporates it into the plan adopted. But to disregard the history of desegregation efforts throughout the country and in Boston as the school committee urges we do by adopting its proposal on a trial basis would be to place the realization of the rights of Boston's black students in a vessel that would begin its voyage rudderless against the wind.

■ The addition of "third-site resource center" experiences does not save the school committee plan from its otherwise total and therefore unacceptable reliance on voluntary choices to produce desegregation. An integrated experience is no substitute for a desegregated education. The court agrees with Judge Doyle in Denver, who stated, when faced with a similar proposal,

The special education programs which are suggested involving the enrichment offerings together with the open school concept and the special programs designed for use in segregated schools are desirable, but the emphasis is on enriched education and can

scarcely be considered a plan for desegregation. Thus, the transporting of students from concentrated schools to enrichment centers for three weeks on a half day basis to intermingle with other ethnic groups while engaging in special programs does not pretend to be a desegregation plan. It impresses us, on the contrary, as a plan which is more designed to avoid adoption of a desegregation plan.

*Keyes v. School District No. 1, Denver,* D.Colo.1974, 380 F.Supp. 673, 682. See also *United States v. Texas Educ. Agency,* 5 Cir. 1972, 467 F.2d 848; *United States v. Board of Educ. of Webster County,* 5 Cir. 1970, 431 F.2d 59; *Dowell v. Board of Educ. of Oklahoma City,* W.D.Okla.1972, 338 F.Supp. 1256, aff'd, 10 Cir. 1972, 465 F.2d 1012, cert. denied, 409 U.S. 1041, 93 S.Ct. 526, 34 L.Ed.2d 490; *Spangler v. Pasadena City Board of Educ.,* C.D.Cal.1974, 375 F.Supp. 1304.

The school committee plan presented no more than a hope for desegregation in Boston. The proposed assignment process promised an administrative nightmare, contemplating a seven-week-long individualized assignment process for over 80,000 children. Ultimately it failed to do what the school committee hoped it would, viz., avoid "forced busing", since it required mandatory transportation of students to resource centers for desegregation purposes. For these reasons and those set out in the Masters' Report in Part I, pp. 9–16, the court adopts their recommendation and holds the school committee plan to be constitutionally inadequate.

Added to the inadequacy of the school committee plan is a history of the committee's failing, when granted time by the court, to file promised plans. The promised Option A alternatives to the state court plan last July were filed but not approved by the Boston School Committee. The time granted from September, when a filing date was established, to December 16, resulted in the committee's repudiation of the plan developed by its school department staff. The month of January was granted for formulation of a plan that failed to promise substantial desegregation. Now, approximately three months before school is due to open in September, time does not permit another court request to the school committee to produce yet another desegregation plan. Under the circumstances the court has no alternative but to take the initiative in devising a desegregation plan. "In default by the school authorities of their obligation to proffer acceptable remedies, a district court has broad power to fashion a remedy that will assure a unitary school system." *Swann, infra,* 402 U.S. at 16, 91 S.Ct. at 1276.

The masters have, in accordance with the court's order of reference, analyzed and considered the plan filed by the plaintiffs and the plan, repudiated by the school committee, which was filed on December 16 with the court. For the reasons stated by the masters in Part I, pp. 17–28 of their report filed March 31, 1975, and because the court finds the plan proposed by the masters with revisions ordered by the court to be preferable for reasons of feasibility, the court declines to adopt either the plaintiffs' proposed plan or the December 16 proposed plan.

### B.

*General Principles Governing Remedy*

In making its findings as to plans submitted by the parties and in deciding upon the remedial orders herein promulgated the court has observed and relied upon the legal principles which are set forth under the subheadings which follow.

#### Basis of Court's Power and Duty

■ The power of the court to order desegregation arises out of the court's finding in June 1974 that the plaintiffs have been discriminated against because of their race and denied equal educational opportunity through intentional segregation. The court is obliged, as it is

empowered, to remedy this wrong. An abiding concern must be to assure that minority students are afforded equal educational opportunity. The plan which the court adopts as a remedy in this case does not rest on any supposed constitutional right of a student to attend a school that has a particular ethnic composition, or whose ethnic composition matches that of the school system as a whole. *Swann v. Charlotte-Mecklenburg Board of Education,* 1971, 402 U.S. 1, 16, 24, 91 S.Ct. 1267, 28 L.Ed.2d 554; *Milliken v. Bradley,* 1974, 418 U.S. 717, 741, 94 S.Ct. 3112, 41 L.Ed.2d 1069 n. 19. Nor does the plan reflect any imagined independent constitutional power of the court to decide what educational policies are desirable for the public school system of the City of Boston. Education is a matter entrusted initially to elected local authorities and appointed state authorities. Even after unlawful segregation has been found, responsibility falls initially upon the local school authorities to remedy the effects of this segregation. *Brown v. Board of Education,* 1955, 349 U.S. 294, 299, 75 S.Ct. 753, 99 L.Ed. 1083 ("Brown II"); *Swann, supra,* 402 U.S. at 16, 91 S.Ct. 1267. Only the default of the school committee in this case has obliged the court to employ the help of the appointed experts and masters and to draw an adequate plan.

■ The goal of the court in formulating a remedy for intentional segregation of the schools is to eliminate government-imposed isolation of blacks within the school system. Largely as a result of school committee actions, most students in Boston attend schools that are either "black" or "white".[4] The remedy in this case must convert this "dual" system to one "without a 'white' school and a 'Negro' school, but just schools." *Green v. County School Board,* 1968, 391 U.S. 430, 442, 88 S.Ct. 1689, 1697, 20 L.Ed.2d 716. This does not mean that all schools in the system must show the same or nearly the same ethnic compositions, but rather that the remedy should eliminate assignment patterns that leave some schools so disproportionate in their ethnic makeup that they are in effect "Negro" or "white" schools—to use the language of *Green.* The remedy also should eliminate conditions likely to produce such school compositions in the future. Exceptional circumstances occasionally can justify exceptions to pursuit of this goal, but the goal remains.

*Barring Affirmative Discrimination*

■■ The defendant school committee must be forbidden to take any further actions affirmatively discriminating against minority students on the basis of race. An order to this effect appeared in the court's opinion and order entered June 21, 1974. Appendix B. It is upon this central concept that the entire desegregation plan rests: that minority students may not be excluded from public school programs or activities on the basis of race, either directly, as happened more than a century ago, cf. *Roberts v. City of Boston,* 1849, 5 Cush. 198, or indirectly, as has occurred more recently. See *Swann, supra,* 402 U.S. at 23, 91 S.Ct. 1267. The simplicity of the requirement that affirmative acts of discrimination must end does not, however, imply simplicity of enforcement. The consequences of years of segregative practices will be eradicated only with great effort and understanding. During desegregation, inefficiencies and failures of responsiveness that formerly were only troublesome can become intolerable. Therefore, the plan in this case includes means to assure effective administration, e. g., elementary schools must have principals. Cf. *Plaquemines Parish School Board v. United States,* 5 Cir. 1969, 415 F.2d 817, 821 n. 2. The plan calls on community

4. See *Morgan, supra,* 379 F.Supp. at 424–25, setting out enrollment statistics for 1971–72. Even after implementation of a partial desegregation plan in September 1974, continu-ing segregation is pronounced at the lower grade levels. See attendance statistics cited by the court at the hearing on April 18, 1975, Tr. 45–49.

districts to develop educational programs suited to the varying needs of students in particular districts. See, e. g., *United States v. Texas,* E.D.Tex.1971, 342 F. Supp. 24, 30–34, aff'd, 5 Cir. 1972, 466 F.2d 518. And help that in other circumstances would be only desirable—the aid, for example, to be provided in this case by the universities and colleges, and by the several citizens' groups—becomes essential. Cf. *United States v. Texas, supra;* and see generally, *Hart v. Community School Board of Brooklyn,* E.D. N.Y.1974, 383 F.Supp. 699, appeal dismissed, 2 Cir. 1974, 497 F.2d 1027. These points are expanded under the subheading, *infra,* entitled "Multiplicity of Measures."

### Preventing Continuing Injury

The plaintiffs in this case do not seek a remedy that would compensate them, as a class, for the injury already wrought by the defendants' long-practiced racial discrimination. That injury, of course, is immense.[5] See *Milliken, supra* (White, J., dissenting), 418 U.S. at 779–780, 94 S.Ct. 3112. The desegregation plan that the court orders cannot make the plaintiffs whole, nor for that matter, anyone who has been affected by the racial divisions in this city, which are in part traceable to the defendants' segregative practices. Rather, the remedy must go beyond an order that forbids further acts of affirmative discrimination in order to assure that past discriminatory practices will work no further harm.

 Years of segregative manipulation of student assignment, school placement and expansion, and like practices found by the court in this case, present what the Supreme Court has described as "a loaded game board"; applied to

such a school system, student assignment policies that ignore race would perpetuate the effects of the past segregative practices. *Swann, supra,* 402 U.S. at 28, 91 S.Ct. 1267. The desegregation remedy in this case therefore must offer more than superficial neutrality. It must meet and neutralize the effects of past discrimination. The Supreme Court repeatedly has stressed this necessity, in requiring that a desegregation remedy do more than give effect to the "free" choices of students and parents, when the effect of these choices is simply to maintain the segregation of schools. See, *Green, supra; Monroe v. Board of Commissioners of the City of Jackson,* 1968, 391 U.S. 450, 88 S.Ct. 1700, 20 L.Ed.2d 733.

The day is past when desegregation is to be achieved through the struggle of a handful of pioneering black students willing to attend a school that is identifiably white. Nor is a simple rule of attendance at the nearest school adequate, when that rule is imposed on a pattern of segregated housing attributable in part to the segregative practices of school authorities. Such a "neutral" geographic attendance arrangement in Boston would sanction a freezing-in of the effects of past discrimination. Long-continued efforts by the school authorities to keep the races apart inevitably are reflected in both residential patterns and school locations and capacities. See *Morgan, supra,* 379 F.Supp. at 470; *Swann, supra,* 402 U.S. at 20–21, 91 S. Ct. 1267; *Keyes v. School District No. 1, Denver, Colo.,* 1973, 413 U.S. 189, 202–03, 93 S.Ct. 2686, 37 L.Ed.2d 548. This is not to say that ethnic and racial housing patterns result entirely from school segregation, but that past school policies would render discriminatory any simple nearest-school policy.[6]

5. It has been suggested that a person denied equal educational opportunity might have a valid claim for money damages against those who denied him this fundamental right. Sugarman, *Accountability Through the Courts* . . ., 82 U.Chi.Schl.Rev. 233 (1974) ; cf. *Wood v. Strickland,* 420 U.S. 308,

95 S.Ct. 992, 43 L.Ed.2d 214, 1975 ; *Tillman v. Wheaton-Haven Recreation Ass'n, Inc.,* 4 Cir., 517 F.2d 1141.

6. At least during the period covered by the trial testimony, Boston never had a true neighborhood school policy. See in *Morgan,*

■ A desegregation plan is to be judged by its effectiveness; see *Swann, supra,* 402 U.S. at 25, 91 S.Ct. 1267; *Green, supra,* 391 U.S. at 439, 88 S.Ct. 1689; *Morgan, supra,* 379 F.Supp. at 482.

### Eliminating Racially Identifiable Schools

■ Fundamentally a desegregation plan must eliminate racial identifiability of schools. Once faculty desegregation and facility equalization are under way, and other marks of a school's racial identification have been removed, the critical identifying quality of the school becomes, of course, the ethnic composition of the student body. When a history of segregation, followed by default of local school authorities in planning desegregation, forces the court to fashion a remedy, it is within the equitable authority of the court to use racial ratios as a starting point in formulating a remedy. *Swann, supra,* 402 U.S. at 25, 91 S.Ct. 1267. Boston's school population of nearly 85,000 students is approximately 52% white, 36% black, and 12% other minority. Of course, no uniform degree of racial mixing of students is or could be required in order to end segregated schools and counter the pervasive effects of years of segregatory practices. See *Swann, supra,* 402 U.S. at 24, 91 S.Ct. 1267; *Milliken, supra,* 418 U.S. at 740–41, 94 S.Ct. 3112. But awareness of the racial composition of the system as a whole provides a reference for determining what are racially identifiable schools within that system. The test of identifiability then becomes substantial disproportion in composition compared to the racial composition of the school system. Cf. *Swann, supra,* 402 U.S. at 26, 91 S.Ct. 1267.

■ A desegregation plan properly may leave some schools all or predominantly of one race where this composition can be shown to result from non-discriminatory considerations. *Swann, supra,* 402 U.S. at 26, 91 S.Ct. 1267. The court's plan in this case leaves some identifiably white schools at the lower grade levels in East Boston. The considerations that support such treatment of these schools are set out *infra* at pp. 238–239.

■ Identifiably one-race schools in a school system are to be eliminated because of two sorts of injury that may be inflicted on the minority students in such a school system. First, racial or ethnic isolation is likely to be felt as an affront. The one-race identification of the school is a continual reminder of the past exclusionary practices of the school system; practices that, the Supreme Court observed in *Brown,* generate "a feeling of inferiority as to the [children's] status in the community that may affect their hearts and minds in a way unlikely ever to be undone." *Brown, supra,* 347 U.S. at 494, 74 S.Ct. at 691. Second, minority students assigned to identifiably minority schools are cut off from the majority culture which is widely reflected in the standards, explicit and implicit, that determine success in our society. See *Brown, supra,* 347 U.S. at 493–94, 74 S.Ct. 686. An individual may decide, of course, that he prefers to avoid the majority culture; but the public school system may not impose that isolation.

This concern is expressed most clearly in the decisions that form the legal foundation on which *Brown* rests: *Sweatt v. Painter,* 1950, 339 U.S. 629, 70 S.Ct. 848, 94 L.Ed. 1114, holding that a black law student must be admitted to the University of Texas law school, and not restricted to a newly-founded law school for blacks, in part because of the value to a future lawyer of contact with the people he later would work with— the predominantly white Texas bar of 1950; and *McLaurin v. Oklahoma State Regents,* 1950, 339 U.S. 637, 70 S.Ct.

---

*supra,* 379 F.Supp. at 473–474, the summary of school committee practices found to be

"antithetical to a neighborhood school system."

851, 94 L.Ed. 1149, holding that a black graduate student admitted to a state university was denied equal educational opportunity by regulations designed to isolate him from the white students, impairing "his ability to study, to engage in discussions and exchange views with other students . . . ."

### Competing Interests

Inevitably, the court's primary concern in a desegregation case conflicts with other legitimate concerns. The remedy must accommodate these other interests. But the accommodation must reflect the primacy of the need to achieve equal opportunity in education. In its respect for a variety of interests, a desegregation plan resembles other equitable remedies. The Supreme Court has stated concisely a rough guideline for reconciling these interests.

> Having once found a violation, the district judge or school authorities should make every effort to achieve the greatest possible degree of actual desegregation, taking into account the practicalities of the situation. *Davis v. Board of School Commissioners of Mobile County*, 1971, 402 U.S. 33, 37, 91 S.Ct. 1289, 1292, 28 L.Ed.2d 577.

The task of a court devising a desegregation plan, then, is to give content to the broad concept, "the practicalities . . .", while at the same time making "every effort to achieve the greatest possible degree of actual desegregation."

A variety of factors require that school ethnic compositions vary in various parts of the school system. Small variations in racial or ethnic composition of schools do not make them racially identifiable nor diminish substantially the degree of "actual desegregation." Where a school departs so far from the systemwide composition, however, as to become racially identifiable, a different question is presented. The school's composition reduces the system's degree of "actual desegregation." Here the "practicalities" requiring this result must be specified.

### "Practicalities of the Situation"

The "practicalities" that require flexibility in a remedy are simply all the legitimate concerns of the community. There can be no exhaustive list. These concerns vary greatly, of course, in their weight. A "practicality" frequently urged upon this court is the desirability of minimizing "forced busing", i. e., assignments to schools beyond walking distance. That concern certainly is legitimate, and entitled to weight. The court's "Guidelines" of October 31, 1974 called for a plan that minimized busing. The plan that the court has ordered into effect reflects the court's continuing efforts to hold compulsory busing to a minimum. The boundaries of the several districts were drawn to minimize the numbers of students bused and to limit distance travelled. A range of racial compositions of schools within each district also serves to minimize busing. Educational concerns also affect the form of a remedy. For example, the districts into which the system has been divided have been drawn so as to include appropriate school facilities at all levels and to avoid where possible one or two grade schools.

Some of the parties have urged that the court limit the extent of actual desegregation lest children from middle class white families leave the public school system and to prevent racial turmoil and violence in Boston's schools and communities. The plaintiffs have argued, just as vigorously, that the court may not consider either "white flight" or the prospect of resistance to desegregation, in formulating the remedy. These prophecies of "white flight" and racial turmoil, like opposition itself, see e. g., *Brown II*, *supra*, 349 U.S. at 300, 75 S.Ct. 753, are not "practicalities" that can be weighed against the rights of the plaintiffs.[7] Opposition to a law-

---

7. Another ground for refusing to limit a remedy for fear of "white flight" is that a court would be presumptuous to try to predict the effect upon long-term trends in pop-

ful desegregation remedy reflects no legitimate interest. Expression of that opposition constitutes a problem, of course, which the desegregation plan must confront in its implementation. But it does not constitute one of the "practicalities" to which the plan itself properly can make an accommodation. The court may not limit desegregation in deference to such opposition. *Monroe, supra,* 391 U.S. at 459, 88 S.Ct. 1700; *United States v. Scotland Neck Board of Education,* 1972, 407 U.S. 484, 491, 92 S.Ct. 2214, 33 L.Ed.2d 75; *Hart, supra,* 383 F.Supp. at 742–43. To hold otherwise would be to trade away the constitutional rights of children to receive a desegregated education in order to appease parents and voters who prefer segregation to desegregation which involves forced busing, i. e., assignments to schools beyond walking distance. The impropriety of such an accommodation has long since been decided. *Brown II, supra,* 349 U.S. at 300, 75 S.Ct. 753; see *Cooper v. Aaron,* 1958, 358 U.S. 1, 7, 78 S.Ct. 1401, 3 L.Ed.2d 5; cf. *Morgan v. Kerrigan,* 1 Cir. 1974, 509 F.2d 580, 587. The rule of law must prevail.

### Multiplicity of Measures

■ Since equal educational opportunity is a central theme of the desegregation remedy, in this case as in others, *Morgan, supra,* 1 Cir. 1974, 509 F.2d 580, 598, n. 29, the remedy must do more than redistribute students. Reassignments to eliminate segregation are one means to the end of providing equal opportunity. The remedy should include measures to assure effective implementation, first, of the ban on active discrimination, second, of efforts to meet the special problems that accompany desegregation: the persisting effects of past discrimination, and the difficulties of transition, for both black and white students, from segregated to desegregated schooling.

■ The plan in this case includes measures directed to these problems. The equalization of services at schools that have been unequal is a task that the universities and colleges have expressed a willingness to help carry out. The plan's provisions for district superintendents, councils of principals within each district, and a principal or headmaster at each school all are intended to assure that a responsible administration will be available to assure that the plan is carried out effectively. Such an administrative network can prevent some schools lagging behind others, cf. *Plaquemines Parish School Board v. United States,* 5 Cir. 1969, 415 F.2d 817, esp. n. 2 at 821; see generally *Swann, supra,* 402 U.S. at 18–19, 91 S.Ct. 1267; *United States v. Jefferson County Board of Education,* 5 Cir. 1967, 380 F.2d 385, 394–395; and see to it that curricula and programs of instruction are not discriminatory. See *United States v. Texas,* E. D.Tex.1971, 342 F.Supp. 24, 30–34, aff'd, 5 Cir. 1972, 466 F.2d 518.

■ The nature of instruction given in the schools must also receive the attention of the court and its representatives. Instruction must be non-discriminatory and avoid racial stereotyping. The court's plan relies primarily on school personnel to assure non-discriminatory instruction. Their efforts will be monitored by citizen groups established under the plan. Other courts have made more detailed orders for the equalization of services, directing curriculum changes, construction, and acquisition of particular types of equipment. See, e. g., *Plaquemines, supra,* 415 F.2d at 831 (facilities to be constructed, including athletic fields with backstops); *Lee v. Macon County Board of Education,* M.D.Ala.1970, 317 F.Supp. 103, 111,

---

ulation movement of its adoption of a particular element, otherwise constitutionally required, in a desegregation plan. The masters received expert testimony on the subject of "white flight" from Boston's public

schools during the current school year and concluded that the contention was a "misleading fiction." Report of the Masters, at 65 n. 1.

112 (curricula of college-level trade schools to be equalized; one school to acquire an appropriate computer). In other cases remedial programs have been specifically required. See, e. g., *Jefferson County, supra*, 380 F.2d at 394. The plan in this case provides for a detailed review of vocational education programs, but in general relies on the performance of school staff and citizen groups to ensure provision of non-discriminatory instruction and services.

 The plan goes beyond assuring that no school is markedly worse than another by providing for the development of magnet programs, so that desegregation may as far as possible occur through voluntary choices. This use of specialized programs originated in this case with proposals in the plan submitted by the defendant school committee, as strengthened and clarified by the masters. Use of magnet programs to achieve desegregation is a method urged by the federal Education Amendments of 1974, Pub.L. 93–380, sec. 214(f), 20 U.S.C. § 1713(f), and supported by a Massachusetts statute providing for state funding for planning and implementation of such programs by local authorities. 1974 Mass.Acts and Resolves c. 636, § 8, Mass.G.L. c. 71, §§ 37*I*, 37J. See *Hart, supra*, 383 F.Supp. 769. In other cities magnet programs have aided desegregation. See *Booker v. Special School District No. 1, Minneapolis, Minn.*, D.Minn. 1972, 351 F.Supp. 799 (approving but not describing plan; the plan's use of magnet schools was described in exhibits submitted to the masters in the instant case).

 In order to develop true "magnets"—programs distinctive and attractive enough to draw ample applications—the plan calls on the expert aid of colleges and universities and of the city's business and cultural communities. Cf. *Arvizu v. Waco Independent School District*, W.D.Tex.1973, 373 F.Supp. 1264, 1280, aff'd in part, rev'd as to other issues, 5 Cir. 1974, 495 F.2d 499 (expert aid used in development of special bilingual, bicultural program in defendants' desegregation plan). These institutions will help each magnet school to build its special emphasis, an emphasis based on the school's present strengths and interests.

## C.

### School Districts

The citywide school district, containing schools at each grade level that are open to students from throughout the city, and the assignment process calling for parent and student involvement in educational choices in all districts are central to the court's plan. The purposes of the plan include the achievement of desegregation through voluntary choices to the maximum extent possible, and the provision of appropriate and attractive educational programs for students "at the end of the busride." Each citywide school has distinctive programs or features than can bring together students with common interests of all races.[8] In order to increase the magnetism of these schools, the court has paired colleges and universities with particular schools. Businesses have worked and will continue working in pairings with high schools. The resources of Boston are rich, and many cultural institutions and other groups have much to contribute to the public schools. The pairings established in this plan with particular schools and colleges and universities will, the court expects, create new links and strengthen old ones between public school students and these institutions of higher education. They can provide a focus for the good will and creative talents and unique resources of these institutions.

Each citywide school's student body will be desegregated and will closely reflect the composition of the city's student population. Students who apply to

---

8. The word "race" where used in this portion of the opinion refers also to ethnic groups such as Hispanics and Asian-Americans classified as "other minority."

a citywide school will know, then, that there will be no overwhelming majority of any race at the school such as might threaten or isolate the student. Cf. *Hart, supra*, 383 F.Supp. at 756. A citywide school, open to all students, will be no one's turf, i. e., will not be the territory of any one neighborhood or race. The goal of this arrangement is to make the school distinctive and attractive because of its concentration on the arts, or the classics, or on open space teaching methods, for example. It is to this end that citywide racial ratios will limit the enrollment at these schools.

The provisions of the plan regarding citywide schools are thus designed to attract students voluntarily to desegregated schools. Voluntary desegregation in this context will allow fulfillment of student preferences as to special programs and features, decrease the likelihood of racial conflict and tension and increase the probability that uninterrupted learning can take place. It is an attempt to achieve desegregated education with the emphasis on education.

■ Community districts and the schools serving residents of those districts recognize the desire of many parents that students attend school within a defined geographical area in which they reside. The districts drawn in this plan reflect only generally concepts of communities as ethnic or racial neighborhoods. Rather, the communities defined by the plan's district lines are communities of schools, serving a defined body of students from kindergarten through grade 13. Parents and students from several neighborhoods will be served by the same group of schools, and through involvement in school activities and local district councils may forge new ties among neighborhoods.

Schools in community districts are equal in educational offerings to citywide schools. Colleges, universities and businesses are also paired with commu-

nity district high schools to aid in developing programs at each district high school which shall offer a comprehensive education that reflects the needs of the district's students.

The district lines in the court's plan have been altered in some instances from those recommended by the masters. A key feature of all student desegregation plans filed and urged by the parties since the court's order of October 31, 1974 has been the division of the city into six or more zones (or "districts") and the desegregation of students residing in those zones using the school facilities located in them. The racial composition of the public school population resident in a particular district was crucial in projecting the racial composition of district schools, whose enrollments would consist primarily of students residing in the district.[9] The masters made substantial changes in the projected racial compositions of community districts from their draft report, filed March 21, to their final report, filed March 31. For example, in the West Roxbury district, the percentage of white students was increased from 70% to 80% and in the South Boston district from 50% to 60%. In order to obtain the most reliable information on which to base projections of the racial composition of districts, on April 2 the court ordered the school committee to file by April 10 an alphabetical list of all students enrolled in the public schools, showing their addresses and ethnicity. When the list was filed it showed, for example, that the projected percentage of white students in the West Roxbury district was 92% and in the South Boston district was 67%; in the district containing the lowest percentage of white students, the Burke district, the alphabetical list showed that the percentage of black students in that district was 63% rather than 50% as estimated by the masters in both their reports. Also, the masters' report filed March 31

9. Student transfers from one district to another had been virtually eliminated by the court's interlocutory order of June 21, 1974 and a series of orders entered later in 1974.

added a provision permitting student transfers from one district to another for reasons including a "revision of program of studies", thereby complicating the task of making reliable projections of the racial composition of student bodies.

The data received by the court on April 10, 1975 raised the probability that the district lines recommended by the masters would define overwhelmingly white areas of the city, such as West Roxbury and South Boston, close to heavily black and Hispanic areas such as the Burke district. This could result in the sort of residential instability that could destroy in a few years the desegregation accomplished initially in those districts. White parents seeking to leave a district where their children were a minority in the school population could move to districts with white majorities, gradually resegregating both the districts they left and those they entered. Just as the location of schools is acknowledged to have an effect on residential segregation, *Swann, supra,* 402 U.S. at 20, 91 S.Ct. 1267, so large disparities in the racial composition of districts may endanger desegregation, and the court has an obligation to seek a plan that offers hope of lasting desegregation. In Boston, a city where it has been possible to draw desegregated districts that are relatively small in numbers of students and to limit transportation distances to an average of 2.5 miles each way within a district, the ability and need constitutionally to achieve a rough equality of racial compositions among districts is strong. The district lines ordered by the court produce districts that, with one exception, resemble adjacent districts in their racial composition, while considering the adequacy, capacity and location of schools at each grade level for the district's student population.

The district lines ordered by the court were also designed to enhance the promising educational proposals made by the masters. Students and parents now, in choosing among citywide and community district schools, will choose on the basis of the educational emphasis at a school as it meets the educational goals and needs of the student, and not on the basis of the racial compositions of a school.

The districts in the court's plan have been drawn to avoid the need to deny students entry to citywide schools because of their race and district of residence. Under the masters' district lines, even the desegregation achieved within a district could be lost were admissions to a citywide school made without regard to the district's racial composition. To preserve desegregation within districts, blacks in West Roxbury and South Boston and whites in Burke might have to be denied a chance to attend the citywide school of their preference because of the need to avoid one-race schools in community districts. With the court's districts, which have a more desegregated student population to work from when allowing citywide admissions, the admissions procedures can permit students of every race from all districts to apply and be admitted to citywide schools while still preventing any community district schools from being overwhelmingly one race.

Another consequence of the receipt of current enrollment data after the masters ended their work was that their plan's promise of a community district seat for all high school students could not be delivered. A shortage of at least 6,000 community district seats appeared. Over the past several years Boston has had a shortage of seats for high school students. There are, however, sufficient seats for the city's high school students overall. Most of the citywide schools in the court's plan are high schools, and close to half of the city's high school students can be accommodated in the citywide schools. If students apply to these schools in large numbers, fewer students will be denied their choice of a community district high school and have to receive assignments to citywide

schools. Moreover, a number of construction projects now in progress will alleviate the shortage of high school seats when completed within the next few years. These include Southwest I and Madison Park High School now under construction and an Occupational Resource Center and Southwest II now in the planning stages.

■ An exception to some of the previous discussion regarding community school districts is the district drawn for East Boston. East Boston, a section of Boston that has a school population, 95% white, of about 5700 students, is located across the harbor and adjacent to the Logan International Airport. It is approached via tunnels that run beneath the harbor and has good public transportation linking it with downtown Boston. The first thing to be noted about the East Boston community district under this plan is that there will be some desegregation of East Boston schools and students. At the elementary level, two schools in East Boston will be citywide schools, with desegregated student bodies. Students residing in East Boston can attend these schools only on a desegregated basis. At the middle school level, the new Barnes middle school, scheduled to open in September 1976, will also be a citywide school, leaving the old Barnes as the only middle school solely for district residents. At the high school level, East Boston Technical High will operate beginning in 1976–77 as a fully desegregated citywide school. Those resident high school students who are not admitted to East Boston Technical High will then be required to attend other desegregated citywide high schools in other sections of Boston. There will be no community district high school in the East Boston school district after the

1975–76 school year. In addition, the cooperative industrial program in machine shop instruction at East Boston High School will for the school year 1975–76 open its entering class and any vacancies in the program to enrollment by students from other districts on a desegregated basis.

Only those East Boston elementary and middle school students who do not choose citywide schools will remain in virtually all white schools. To desegregate these 11 schools in that section of the city would require transporting between four and five thousand children either into or out of other parts of Boston, many through the tunnels with their gassy air at heavy traffic hours, for distances of up to 5.2 miles one way. In addition, unless the schools and students of East Boston were divided among two or more districts, which would deny East Boston residents any concept of a community of schools, the merging of East Boston with the Madison Park District would create a geographically large district and place a further burden on black and other minority students by dispersing them to Back Bay, downtown, the North End, Charlestown and East Boston. The treatment of East Boston under the court's plan does not in our view deny or deprive the plaintiffs of the full vindication of their constitutional rights. There will be no segregated, predominantly black schools under the court's plan.[10] We find, therefore, that the slight advantages of desegregating those East Boston schools which will remain nearly all white under the plan are outweighed by equitable considerations of geography, education and burden of transportation in this instance. As to the prospect of East Boston becoming a haven

10. The cases are distinguishable, therefore, in which the incorporation of a geographically separate area was needed in order to desegregate the system's predominantly black schools. See, e. g., *Davis v. Board of School Commissioners of Mobile County*, 1971, 402 U.S. 33, 91 S.Ct. 1289, 28 L.Ed.2d 577; *United States v. Greenwood Municipal Separate School District*, 5 Cir. 1969, 406 F.2d 1086, *cert. denied*, 1969, 395 U.S. 907, 89 S. Ct. 1749, 23 L.Ed.2d 220; *United States v. Indianola Municipal Separate School District*, 5 Cir. 1969, 410 F.2d 626, *cert. denied* 1970, 396 U.S. 1011, 90 S.Ct. 571, 24 L.Ed. 2d 503.

for Boston parents seeking to avoid desegregation and thereby resegregating other districts, no party has contended that this will occur and we think it unlikely.

The districts in this plan and the guidelines for assigning students have been drawn to minimize required transportation as much as possible consistently with desegregating the city's schools. It should be remembered that busing has been commonplace in Boston public schools for decades. In 1972, the school committee leased 129 buses for student transportation each day. And, in 1972, more than 30,000 students—roughly 35% of the entire student population—were bused or used the subway daily to and from school. While, as stated in the plan, it is not possible to desegregate Boston's schools without mandatory transportation, distances and times travelled will be reasonable compared to those required in other desegregation cases and, for elementary and middle school students, within the bounds of their school districts. The plan's estimate that approximately 21,000 students will be mandatorily transported rests upon an analysis by the court-appointed experts. Only rough estimates can be made because the number of students who will choose to attend citywide schools and programs cannot be known until after completion of the assignment process.

The court has heard members of the school committee in testimony and others speak against "forced busing" and has received hundreds of letters protesting its use in connection with the state court plan currently in operation. Toward lessening widespread misunderstanding on the point, it may be stated that the court does not favor forced busing. Nor, for that matter, have the plaintiffs advocated forced busing. What the plaintiffs seek, and what the law of the land as interpreted by the Supreme Court of the United States commands, is that plaintiffs' right to attend desegregated schools be realized. That

right cannot lawfully be limited to walk-in schools. *Swann, supra,* 402 U.S. at 30, 91 S.Ct. 1267. If there were a way to accomplish desegregation in Boston without transporting students to schools beyond walking distance, the court and all parties would much prefer that alternative. In past years, feasible proposals that would have substantially lessened segregation through redistricting without busing were made by various public agencies and uniformly rejected or evaded by the Boston School Committee. The harvest of these years of obstruction and of maintenance of segregated schools is that today, given the locations and capacities of its school buildings and the racial concentrations of its population, Boston is simply not a city that can provide its black schoolchildren with a desegregated education absent considerable mandatory transportation. No party familiar with the requirements of the law and with the city has ever suggested otherwise.

Regrettably the same cannot be said about various elected officials. This is an election year in Boston and candidates are already campaigning for municipal offices. Many of them are proclaiming that they are for school desegregation but against forced busing. They refuse to face up to the dilemma stated by school committee member Kerrigan in his testimony, *supra* p. 226, as follows:

"It is unfortunate that is the way our society exists, the way the housing patterns are laid out, but the only way you are going to desegregate city schools is through forced busing."

They tell the parents that they will take steps to bring about an amendment to the federal Constitution that will ban forced busing, neglecting to add that it takes several years to adopt even a relatively noncontroversial amendment. Meanwhile the children suffer.

In the court's opinion the effect of mandatory transportation on students can be neutral or destructive, depending upon the community's response to the

requirements of the law. Here "community" means not only parents and school department personnel but also leaders of civic, religious, fraternal, business, labor, educational, cultural and other organizations and institutions. If the atmosphere surrounding desegregation is such that a child goes to a school where children of other races welcome him without fear, and where he can learn in an educationally productive atmosphere, the fact that his school is a bus-ride away may be little more than an inconvenience. This is not to say that enormous efforts will not be required to reduce racial tensions which have increased in Boston during the current school year, and which continue to be exploited by various elected officials. No effort will be spared to assure the safety of students while attending or en route to a school. Many public and private agencies will be working for peaceful implementation of the plan, including the 42 member Citywide Coordinating Council recently appointed by the court. The plan adopted by the court attempts to minimize forced busing and mute the legally pointless controversy surrounding it, while at the same time advancing the positive goal of improving the quality of education available in Boston's public schools for all students whatever their race or ethnic origin.

### D.

### Guidelines for Assigning Students

The plan's assignment guidelines aim, first, to make sure that schools are not identifiably one-race, and secondly, to assure that no racial or ethnic group—black, white or other minority—is disproportionately isolated in any school, considering its share in the relevant student population. The first aim is of course basic to desegregation. But the second, important to the remedy's durability, accounts for the greater part of the plan's detailed assignment provisions.[11] In assignments to citywide schools, the guidelines seek to prevent isolation very simply, by providing for close adherence to systemwide composition. Cf. *Hart, supra,* 383 F.Supp at 756 (magnet school composition to lie within ten percentage points of district composition). Since the citywide schools enroll students from throughout the system, the lack of the geographical constraints such as control assignment guidelines in community districts permits enrollments at these citywide schools reflecting the school system's overall enrollment. Other reasons for the setting of ranges of racial composition in citywide schools have been explained in the previous section of this memorandum. In community districts, the assignment guidelines allow for generally wider variations, but still within limits designed to achieve the same goal, preventing disproportionate isolation.

The variations in the composition of community district schools recognize the central importance of minimizing the distance between the student's home and the assigned school, especially at the elementary level, and the practical difficulties of making geographical assignments. Each community district school will have assigned to it an attendance area made up of a set of "geocodes."[12] Geocode assignment, un-

11. The plan's student assignment guidelines set out a process for assignment, rather than a finished attendance plan. A finished plan for community district schools, showing the geocode areas served by each community district school, is to be drawn by the school department pursuant to the guidelines and will be reviewed by the court. The review will consider not only whether the school compositions lie within the guideline limits but also, more generally, whether the assignments show a reasonable accommodation, within the permissible ranges, of the several interests the plan is designed to serve.

12. "Geocodes" are the 800-odd areas, each several blocks in size, into which the school department has divided the city for planning purposes (as noted in the plan, p. 252). The units were devised originally for police reporting purposes and vary in geographical area and also in student population, ranging from a few to several hundred students.

like individual or address assignment recommended by the masters,[13] allows students to attend school with their immediate neighbors of all races. Assignment by geocodes can be done much more rapidly than assignment by individual address, and will enable notification of parents of student assignments at an earlier date. Use of geocodes means, for example, that if most of the students residing in a geocode are white, and that geocode is assigned for desegregation to a school in a black area, any black students living in that geocode will also be assigned to that school. Thus some transportation of black students into black areas, and of white students into white areas, will occur and in this sense will not be directly desegregative. However, geocode assignments offer the advantage of fostering contact of students in school with their neighbors at home within a geocode. Students who are transported to school will travel with their neighbors, attend school with them, and be able to maintain ties developed in school while in their home neighborhoods. The advantages of geocode assignment, speed and even group treatment, make it preferable in the court's opinion to a system of school assignment that separates next door neighbors consistently on the basis of race. The difficulty of fitting the disparate geocodes to the system's irregularly distributed school facilities demands some leeway in school composition.[14] This leeway, easing the assignment process, operates also to diminish the amount of busing that is required.

▮ The guidelines provide this appropriate latitude for assignments to community district schools. The limits on variation have been determined by considering the competing interests that to the court seem most important. Once racially identifiable schools have been eliminated, two primary concerns remain: on the one hand, to allow students to attend school near their homes; on the other hand, to minimize any sense of isolation that students, white, black or other minority, might feel. The guidelines accommodate these two interests by letting the breadth of variation [15] depend on the size of the racial or ethnic group that is considered. A large group can accept a relatively large reduction in numbers without its members' feeling the discomfort of relative isolation. Members of a small group reduced by the same number of students might be reduced to such an extent as to feel isolated, uneasy and defensive. That is the basis for the guidelines' use of a constant percentage (25%) to define variation limits: the larger the group, the larger will be the possible variation in the number of students of that group assigned to a particular school.

The assignment guidelines are intended to assure that "other minority" students will also be afforded "equally desegregated education", as stated in this court's order of October 31, 1974. They therefore provide for assignments that neither isolate nor excessively concentrate "other minority" students. . This policy is adopted in the interests of all, not only for the sake of the "other minority" students. Taking advantage of Boston's ethnic variety, then, the guidelines provide that in the districts with substantial numbers of "other minority"

---

13. The relative merits of assignments by address and by geocode are discussed at length in the State Defendants' Critique of Masters' Plan filed April 8, 1975, at pp. 48–51.

14. The same necessity supports the plan's provision, at p. 72, that geocodes may in some instances be divided into as many as three parts.

15. Variation is measured from district rather than system composition in community district assignments. Each district's schools will enroll only students residing in the district. The range of racial compositions in the schools within a district will be determined by reference to the percentages labeled "K–13 Total" at the bottom line of the tables following the eight district maps appearing in the plan.

students (about half of the eight community districts), students from that group will be enrolled at each school. In Madison Park District, for example, at every district school each of the three major racial or ethnic groups will be strongly represented, but none will make up a majority. "Other minority" students in this district—slightly more than half of them Oriental, most of the remainder Hispanic—will constitute from one-fifth to slightly less than a third of each school's student body.

The plan's assignment guidelines thus take account of "other minority" students, but do not simply aggregate them with black students, in prescribing school composition limits. Plaintiffs-intervenors, El Comite de Padres Pro Defensa de la Educacion Bilingue, representing the class of Spanish-speaking students and their parents, have stressed their right to adequate bilingual education. The remedy accordingly concentrates on providing bilingual schooling for Hispanic students and for others in need of this service.

Assignment of bilingual students before others will prevent excessive dispersal. Thus the "clustering" of bilingual classes will be possible and Boston's schools will be enabled to fulfill the promise of this state's exemplary bilingual education law (Transitional Bilingual Education Act, Mass.G.L. c. 71A), as well as to meet the requirements of the federal Civil Rights Act of 1964 (42 U.S.C. § 2000d). See 35 Federal Register 11595 (1970); *Lau v. Nichols,* 1974, 414 U.S. 563, 94 S.Ct. 786, 39 L.Ed.2d 1; *United States v. Texas Education Agency,* 5 Cir. 1972 (en banc), 467 F.2d 848, motion to clarify mandate denied, 5 Cir. 1973, 470 F.2d 1001.

Without merely aggregating black and other minority students, the guidelines prescribed at pp. 72–76 of the plan (in conjunction with the racial compositions of the various community districts) nevertheless provide that plaintiff black students shall not be assigned to schools with only "other minority" students. Cf. *Arvizu v. Waco Independent School District,* W.D.Tex.1973, 373 F.Supp. 1264, 1268–70, aff'd in part, rev'd as to other issues, 5 Cir. 1974, 495 F.2d 499. This result is appropriate to satisfy both of the primary concerns of desegregation. Black students should not be assigned in a manner that suggests they have been relegated to "minority" schools; for the "segregated" quality of a school depends in part on the way the community looks upon that school. See *Keyes, supra,* 413 U.S. at 196, 93 S.Ct. 2686. And black students ought not to be assigned in a manner that isolates them from the majority culture. The assignment guidelines aim for three-way desegregation in the schools for two primary reasons: first, to provide a proper remedy for the plaintiff class of black students and parents; second, to afford to all groups—white, black and other minority—the sense of adequate representation that can help achieve peaceful and lasting desegregation.

E.

*Examination Schools*

The desegregation of the examination schools, Boston Latin School, Boston Latin Academy, and Boston Technical High, particularly the two Latin schools which have six-year programs beginning in the seventh grade, has been a particular subject of concern to the parties and the court throughout the process of formulating a remedy for implementation in the fall of 1975. Yet despite many hours of attention, the parties and the court have had very little data with which to analyze the effects of various proposals affecting the grade structure and admissions process of these schools. Much information was filed on May 2, 1975 which will have to be analyzed by the parties and the court before it is used to aid in the establishment of admissions criteria for future years and for other purposes. But the need for additional information and for evaluation of the results of proposed and or-

dered procedures are the reasons for the interim nature of the court's order with respect to the examination schools.

The school department's computer data of April 9, 1975 show 113 blacks and 13 Hispanic students at Boston Latin School out of a total of 1893 students; and 97 black and 7 Hispanic students out of a total of 1097 students at Boston Latin Academy. Boston Technical High is less segregated, with a student population that is 67% white, 25% black and 8% other minority.

 All of the proposals made by the parties and the masters for desegregation of the Latin and Technical schools have directed desegregation efforts toward the entering grades at those schools, the seventh and ninth grades. The program at the examination schools is one that each year builds upon the subjects taken the prior year and which differs in content from the general comprehensive high school's curriculum. The Latin schools provide a strong emphasis on classics and languages; Technical High, on the areas of mathematics and science. Introduction of new students at every grade could seriously affect the programs at the schools and leave the students entering those particular grades without the prior years' preparation that is needed to keep pace with and fully benefit from the programs at these schools. The court finds that desegregation of only the entering grades at the examination schools, instead of desegregating all grades at once, is plainly appropriate in this case. The students already in attendance will be unaffected by the court's order, except for the addition to the present eighth grade (grade nine next fall) of a relatively small number of students admitted on a desegregated basis. A gradual desegregation of the entering classes will allow the school department the opportunity to identify

and recruit increasing numbers of black and Hispanic students who are qualified to attend and succeed at the examination schools.

Students' scores on the SSAT examination, either alone or in combination with grade point averages, have been proposed by several parties for use as criteria for admission to the examination schools. The Latin School Alumni Associations, acting as amicus curiae, developed the most detailed proposal, which was adopted by the School Committee. Under their proposal, 65% of the seats in the entering classes would be filled solely on the basis of SSAT scores, without regard to race. The remaining 35% of the seats would be filed on a ratio of 25 blacks to 10 whites, using SSAT scores in combination with grade point averages, but setting a score in the 50th percentile on the SSAT as a floor for admission.[16] No evidence or data has been received that would demonstrate that this use of the SSAT would result in substantial desegregation of the entering grades at the examination schools. The only evidence on this issue, filed by plaintiffs, shows that using the results of the *1973* SSAT examination, a use of the median score as a floor for admissions would have created entering classes of 10% black at Boston Latin School, 20% black at Boston Latin Academy and 19% black at Boston Technical High. The affidavit of Mr. Wilfred L. O'Leary, headmaster of Boston Latin School, while urging use of the 50th percentile as a minimum standard, concedes that this standard is an assessment based on his experience, not on racial data or studies that would show that students scoring below that mark would be unable to learn and succeed within the Latin schools' program.

 Nor is it clear that the SSAT is the most valid or even a generally valid method of identifying black and

16. Under the court's order, the Latin School Alumni Associations' proposal can be implemented if to do so would result in entering classes at the seventh and ninth grades containing 35% combined black and Hispanic enrollment.

white students who can benefit from a Latin school curriculum. It is attractive because it is available, and apparently has value as a predictor of academic success. It is generally accepted, however, that blacks fare worse on this type of examination. There have been suggestions, but little evidence, that the SSAT itself is a culturally biased test. But more significant is that given the segregated history of the Boston public school system at the elementary school level, in particular the segregation still existing in advanced work classes, which successfully feed children into the examination schools and "prep" them for the examination, any use this year of an arbitrarily selected SSAT examination score cut-off that prevents the desegregation of these schools must be rejected. We do not have the information to suggest that a cut-off of the 50th, 40th or other percentile is an appropriate minimum standard. Nor can we say that it is impossible to develop admissions criteria that do identify students, black and white, as having the ability to benefit from and succeed in these schools' programs. We encourage the parties to work together on evolving such standards for use in future years. It is for these reasons that the court has made no specific all-inclusive order as to criteria for this year, but has, rather, permitted the school department to use grades and test scores as it deems appropriate to obtain desegregated entering classes at these schools.

The examination schools are citywide schools and are treated by the court plan as part of the network of magnet schools in citywide school district 9. In desegregating through citywide magnet schools, the plan requires that the enrollment at these schools be within a ten percent range of the racial composition of the school system as a whole. All other citywide schools will enroll new students at all grades in the fall of 1975, and will be at least 44% black and other minority. Because of the special nature of the examination schools, a more gradual process of desegregation has been adopted for these schools. As discussed above, only the entering classes at the schools are required to enroll new students, in order to preserve the strengths of the schools' sequential curriculum. And a minimum percentage of 35% black and Hispanic has been set for the entering classes, as contrasted with the 44% black and other minority enrollment required at other citywide schools. The main reason for this lower minimum requirement in desegregating the examination schools is that all grades at the examination schools now enroll between 6% and 8% Asian-American students. Thus the anticipated enrollment in the entering class at the examination schools will be similar regarding racial and ethnic composition to that at other citywide high schools.

The masters recommended the phased elimination of the seventh and eighth grades at the Latin schools, to create a 9–12 grade program that conforms in grade structure to the rest of the public school system. Other parties have proposed the addition of a sixth grade, or the separation and creation of a Latin middle school, for the same reason. There are a number of educational reasons that either support or counter such proposals. If the Latin schools can be desegregated at the seventh and eighth grades, there is no necessity for discontinuing those grades as part of a desegregation remedy.[17] Should successful desegregation not be possible in this way, however, jurisdiction has been specifically retained regarding elimination of grades seven and eight, addition

---

17. The point has been made that it is desirable for all students in the system to choose their desired high school program at the same point, the end of middle school, in eighth grade. The Latin schools do, of course, take a limited number of students who enter at the ninth grade. There has, however, been no evidence that the existence of an earlier opportunity to enter the Latin schools disadvantages or denies equal educational opportunity disproportionately to black students.

of grade six, or other changes in the grade structure at the Latin schools. The school committee may for educational reasons make such changes in grade structure so long as they assure and do not impede desegregation at all grade levels.

The remainder of the plan adopts proposals of the Latin School Alumni Associations and the school committee for ongoing evaluation of admissions criteria and racial data, increased recruitment of black and Hispanic students, and desegregated preparatory and remedial programs.

## F.

### School Closings and Capacities

 The plan calls for the closing of twenty school facilities, listed on p. 7, most at the elementary level. Ten other facilities which are now closed will remain closed under the plan and will not be rehabilitated. There are several school facilities, including the Old Quincy, the Washington Irving portables, the Bigelow portables and the Horace Mann school, which are not listed in the court plan either as schools to be closed or as usable facilities. The timing of the planned closing of the Old Quincy school and the future use of the other facilities are to be resolved through discussions between school department staff and the court-appointed experts, subject to the approval of the court.

The closing of schools as part of the plan serves a number of purposes. Many schools in Boston have long been recommended by many agencies, independent experts, and by the city and state, for closing or replacement as unfit for school use. The necessity of reassigning students for desegregation provides an opportunity to close some of the worst of these schools and make use of the more structurally sound facilities. A major reason for closing schools is that desegregation is more easily and economically achieved through the consolidation of student bodies. Many of the city's elementary schools in black areas have in the past been overcrowded;

many elementary schools in white areas have been underutilized, e. g., when a new school was constructed to replace an old one in a predominantly white neighborhood, the school committee accommodated parents protesting the closing of the old one by keeping them both open. Should school facilities be uniformly used to capacity, an excess of several thousand available seats at the elementary school level would remain. Thus a number of the older elementary schools can be closed, with accompanying savings of the costs of operating and heating those schools. Elementary schools will be kept open whose locations enable busing to be minimized overall, and which permit the more efficient assignment of students by geocodes, accomplishing desegregation and minimizing the need to split geocodes. Uniform utilization of facilities throughout the city will also tend to equalize the availability of the system's resources to all students.

School closings are being ordered on the basis of expert assessment of excess seating capacity for the number of students who will be in the schools in the various districts in the fall of 1975. The capacity figures listed in the plan are ceilings which may not be exceeded. These ceilings were set by the court-appointed experts after taking in most instances the most conservative of the estimates provided by state, city and school department officials and then further reducing that estimate in order to be on the safe side. Enrollments in most cases will be well below those ceilings, and will reflect the judgment of the school department and the court-appointed experts, subject to court review, as to what constitutes full and efficient utilization of the educational facilities of a particular school. The number of students attending district schools in 1975–76 will be less than the total number of residents in a district who enrolled in a public school this year, partly because substantial numbers from each district will be attending citywide magnet schools and programs. Also, over 2,000 students who enrolled in school at

some time during 1974–75 have attended school on less than one-third of the school days during the current school year, suggesting paper projections for next year of a tighter fit between seats and students than may materialize in the classroom. It is not expected that any condition of overcrowding at the elementary or middle level will occur.

However, if overcrowding or other problems due to inadequate space should develop, they may not be solved by using unsuitable space such as hallways, utility rooms, auditoriums and the like. If need be, one or more schools that the plan states shall be closed may be reopened. It is the plan's purpose that no elementary or middle school student will have to attend school outside the community school district of his residence usless that is the student's or parent's preference. The court's decisions as to assignment processes, school closings and capacities which have been incorporated in the plan have all been controlled by this goal.

As many as 55 of the approximately 167 school facilities in Boston have been recommended for closing or replacement by various agencies. Closing schools is always a difficult decision, especially since some schools whose location and physical condition compel their closing have promising educational programs. Attempts have been made to close schools that are in poor condition or unsafe in both black, other minority and white areas to avoid burdening any one group unfairly. We find that on the basis of the factors discussed, the closing of each of the twenty schools listed in the plan is warranted.

## G.

### Magnet Schools and Programs

At present Boston has a number of schools with distinctive or magnet programs attracting students from throughout the city. At the high school level these schools include Boston High School, Boston Latin Academy, Boston Latin School, Boston Technical School, Boston Trade, Copley Square, and the Occupational Resource Center. Additional citywide schools with distinctive programs have been added by the plan. To assist the Boston school system in developing the new magnet programs and also in improving the quality of education throughout the school system, the plan adopts the concept of pairing of colleges and universities with particular schools, developed by the masters. Twenty colleges and universities have been paired with particular schools in both citywide and community school districts, and collaborative efforts have already begun with the assistance of an ad hoc committee of attorneys appointed by the court. Planning between the public schools and the colleges and universities is being directed toward the formulation and implementation of programs to provide distinctive, non-discriminatory educational instruction. The process of planning and developing new educational programs is a complex and continuing one. It is impossible to predict whether programs now in the planning stage will have been developed completely by the fall of this year. However, a great amount of effort is currently being expended. Funding of $900,000 for planning by colleges and universities has already been allocated by the State Board of Education, and the court, after hearing, has ordered the school committee to employ during the coming summer months teachers and administrative personnel reasonably necessary for the joint planning process. The state Secretary of Education has recommended the allocation of additional funds to assist implementation of this feature of the plan when schools open in the fall. The United States Office of Education has designated Boston as highest priority for obtaining federal Emergency School Aid Act (ESAA) funds. The Regional Director of HEW has agreed to exert every effort to obtain all possible funding for planning and implementing program components developed in this effort. In addition to new programs, magnet-type programs which were in existence during the 1974–75 school year will continue and in

some instances will have been expanded by the time schools open in the fall.

College and university assistance will be aimed at improving and equalizing the learning outcomes of students in whatever program, school, or district the college works with. The approaches taken by the paired partners may include staff development and training, the design of instruction, materials and methods planning or other organizational processes basic to the school or district and concentration on community relations. The choice will depend upon a joint estimate of what is needed, and a determination of how the capabilities and interests of the college or university can best serve these needs. The court does not expect miracles or the achievement of unattainable goals within limited time constraints. The court does believe, however, that each college and university can work out one or more tangible, promising lines of educational development in company with its public school counterpart. The court appreciates the pledges of full cooperation by the colleges and universities received in writing and in meetings it has had with the presidents of the institutions of higher learning. The significance of this pairing effort is as a long-term commitment, a promise to the parents and students of Boston that these institutions, with their rich educational resources, are concerning themselves in a direct way with the quality of education in the public schools.

The court adopts the masters' recommendation that contracts or memoranda of agreements be developed between the colleges and universities and the Boston public schools. The court has ordered the school department to use its best efforts to negotiate a contract pertaining to each paired school acceptable to both the school committee and the contracting institution of higher learning. The superintendent has become involved personally and has appointed a coordinator to supervise exchanges of information and suggestions between the colleges and the faculty and staff at paired schools. Developing a written agreement is in itself a means of getting the parties together. Discussions now in progress may resolve such questions as scope of authority, division of responsibility, communications and control procedures, access, planning and review schedules, conditions for withdrawal by one or both parties, ownership of or editorial control over reports on projects, and other points. The contracts may identify the locus of control over different resources, whether exchanges in kind or receipt and handling of funds. In some contracts, the school department may serve as the fiscal agent and in others, the college or the State Education Department or some other third party close to the project. A contract or memorandum of agreement may also make plain those spheres in which the college would take no responsibility. The working conditions and contractual obligations of Boston teachers will be respected in these efforts. The officials of the Boston Teachers Union have supported the pairings developed by the masters.

In the court's view it is important to the success of these efforts that the agreements between individual colleges or universities and the school department be the result of negotiations by both parties, and be tailored to the particular roles settled on by the parties in each instance. Therefore, the court has refrained from mandating any form of agreement or terms that a contract must include. The importance of this effort to the success of the court's plan for desegregation of the schools and particularly to the voluntary component of this plan, however, leads the court to reserve jurisdiction to make further orders in this area should they become necessary.

The commitments of businesses primarily through the Boston Trilateral Task Force to continue and enlarge programs of support to the schools through similar pairings, and of the Metropoli-

tan Cultural Alliance to continue its innovative and enriching programs and focus them on aiding in the peaceful desegregation of the schools are also major contributions. From the rich resources of the Boston area, other groups such as labor organizations, may join in planning programs with the schools, possibly through pairings like those established in the plan. A committee of the Boston Bar Association is making continuing efforts to aid in developing institutional support. The efforts of so many people to enrich public education in such diverse and promising ways will help ease the transition of Boston's school system from a dual system to one with no "black" schools or "white" schools, but just schools.

### H.
### Citizen Participation, Monitoring and Reporting

The court adopts with some modifications the masters' recommendations for the establishment of a Citywide Coordinating Council with responsibility for monitoring implementation of the court's desegregation orders, and for community District Advisory Councils that provide a structure for community participation. The court has related to these new groups the racial-ethnic councils of parents and students citywide and at each impacted school which were established by orders entered in 1974. The court endorses, as did the masters, the continued independent service of the Home and School Associations, the Citywide Educational Coalition and other groups working to enhance the quality and equality of education in the public schools of the city.

Proposals for some court-established method of citizen participation and monitoring were put forward and supported by the parties as early as August of 1974. On October 4, 1974 the court issued an order, which all the parties had a part in drafting, establishing racial-ethnic parent and student councils ("RPCs and RSCs") at many schools, to deal with racial tensions and problems at the individual school level. A citywide parents' advisory council ("CPAC") was established to coordinate activities and disseminate information among school RPCs.

The establishment of a citywide group of citizens charged with informing the community and monitoring implementation of the court's orders regarding desegregation had been supported by most, if not all, of the parties. In the fall of 1974, the Community Relations Service (CRS) of the United States Department of Justice prepared at the request of the court a report on the structure, function and success of the court-appointed citizens' committee in Denver, and on those in a number of other cities operating under desegregation orders.

Based on the information gathered by the CRS, the court finds that a citywide coordinating council of approximately 40 members will form a broad-based group whose membership will reflect the richness of Boston's human and community resources. Use of a committee structure such as exists in the Denver model will enable efficient and effective functioning of the council despite the large number of members.

The court also adopts the masters' recommendation for the establishment of district advisory councils. Each district council will have a membership of ten parents, out of a maximum of 20 members. The size of the council can vary to include representatives of community groups and other agencies active in public school education in the particular district. RPCs and RSCs will provide a logical representative route to fill the parent and student seats on the district councils: the plan provides that parent and student district council members be selected by members of RPCs and RSCs. Elections of RPCs and RSCs are open to all parents of students attending school and to all attending students. The previously established racial and ethnic compositions of RPCs and RSCs will ensure that parental and student representation on district councils will be racially and ethnically diverse, without the

need to set further racial and ethnic quotas.

Numerous cases provide support for the establishment of biracial and multiracial groups to act as advisory and monitoring bodies during the desegregation process, e. g., *Singleton v. Jackson Municipal School District*, 5 Cir. 1970, 426 F.2d 1364; *Keyes v. School Dist. No. 1, Denver, Colo.*, D.Colo.1974, 380 F.Supp. 673. The structure established here will aid in the accomplishment of peaceful and constructive desegregation of the schools.

 As a method of informing the court of the progress of desegregation in the school system, we have adopted the masters' recommendation and require the filing of annual reports by the Superintendent. The information required includes data suggested by the masters as a part of these reports, as well as other information required in other desegregation cases such as those in Denver and in Jackson, Mississippi.

The masters' recommendation that the school department file a report on the design and implementation of a uniform disciplinary code has not as yet been acted upon. The court is, of course, concerned with the nondiscriminatory enforcement of discipline in the schools and with the due process rights of all students. See *Wood v. Strickland*, 1975, 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214; *Goss v. Lopez*, 1975, 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725. However, because of the pendency of motions filed by the Children's Defense Fund and others concerning student discipline, this matter will be the subject of separate future hearings and orders.

## IV

### *Conclusion*

The student desegregation plan ordered by the court for Boston's public schools is a complex design. A network of citywide magnet schools with distinctive features and particular assignment guidelines has been combined with the division of the city into geographically bounded school districts. Within these districts assignments to schools are governed by separate, yet interdependent guidelines. The assignment process calls for parents' and students' choices of educational programs to be considered individually and granted where possible consistently with desegregation. Consideration of dozens of special programs and problems is reflected in the many specific provisions of the plan. Particular provisions deal with assignment of kindergarteners, high school seniors, students now in vocational education programs, attendance at the examination schools, students requiring bilingual education or special needs attention, and students receiving Title I services.

Colleges, universities, businesses and cultural institutions have accepted invitations to work along with the school department to develop programs in citywide and district schools that will be educationally sound and attractive, and to expand and improve existing programs. A network of organizations for citizen participation and monitoring will be established. Racial Ethnic Councils of parents and of students will meet at the individual school level and representatively in a Citywide Parents Advisory Council. There will be Community District Advisory Councils in every school district where parents, students, school staff and others involved in education in that district can meet to discuss the educational needs of the district and to monitor the peaceful desegregation of the district's schools. A Citywide Coordinating Council composed of members of core city communities and of the Greater Boston business and educational community will monitor and work for peaceful desegregation of the schools under the court's orders.

The plan does not order the involvement of Boston's suburbs in the desegregation remedy. As of this date, there has been no factual showing that "racially discriminatory acts of the state or local school districts [i. e., school systems], or of a single school district have been a substantial cause of *inter-district*

segregation" (emphasis added), the legal basis outlined by the Supreme Court in *Milliken v. Bradley,* 1974, 418 U.S. 717, 745, 94 S.Ct. 3112, 3127, 41 L.Ed.2d 1069, as necessary before any formulation of an interdistrict remedy. A motion by the Mayor addressed to this issue has been briefed by the parties and awaits future hearing. However, the court encourages the continuation of the voluntary, cooperative efforts being made in programs involving suburban and Boston schoolchildren.

The timetable in the court plan sets forth the numerous important steps that must be completed before desegregated schools can receive students next fall. This list is incomplete, as it must be. No specific orders could cover all the planning and activities that must take place in many areas, from magnet programs to building renovations to contracts for transportation to security measures to training of teachers and staff, etc., in order to fully implement the plan.

The cooperation and efforts of persons not parties in this case will also be needed. The training and sensitivity of Boston's teachers to the human problems attending desegregation, and their energy in developing magnet programs and devising non-discriminatory curricula will be essential. Parents are asked to become involved in choosing among educational programs for their children and in serving on the various councils that will deal with the conflicts and problems which are inevitable in the desegregation process. The indispensable collaboration of paired colleges, universities and businesses has been discussed at length. City and state agencies will be called on for expertise and assistance in the conversion and construction of facilities, the provision of safety and security for students in and out of school, the financial requirements of desegregation, the development of magnet educational programs and in other areas.

The plan and the demands of its implementation on the people of Boston are necessarily as diverse and complex as the needs and characteristics of the city's public schools. The extent to which it will succeed in desegregating the public schools and improving the quality of education given in them remains to be seen. One thing, however, seems clear: the education of a generation of Boston students is at stake. It is the students in the schools who will be directly and permanently affected by the way the citizens of Boston carry out the plan.

## V. Excerpts from Student Desegregation Plan

### A. THE COMMUNITY SCHOOL DISTRICTS

*Definition and Purposes*

A Community School District is an area of the city, clearly bounded by identifiable lines on a map, within which all residents are entitled to attend the public schools in that area, as seat capacities may allow. Maps, geocodes and facilities tables of the eight community districts appear *infra,* on page 253. The purposes of these Districts are: (a) To accomplish desegregation of the schools in conformance with constitutional principles; (b) To correlate the programs and operations of public educational services with the needs and interests of residents and students within a natural unit or combination of units of the residential communities of Boston; (c) To enable parents and students to plan a coherent sequence of learning experiences within an identifiable series of schools that culminate in Community District High Schools; (d) To minimize the costs and burdens of transporting students, staff, and material between distant points in the city; and (e) To utilize existing facilities fully and efficiently.

No Community District boundary shall be modified except on notice to the parties with the review and approval of the court. Community District schools shall be equal in quality and status in all respects to Citywide schools and programs. No teacher or school administrator in a Citywide school may remand a student to a district school as unsuitable for the Citywide school or as

a punishment. Neither may schools in any Community District develop alternative programs which operate *de facto* as preventive detention or short-term segregation facilities. There shall be no segregation of students within schools, classrooms, or programs in the school system.

### Administration

The city defendants shall forthwith appoint, or transfer from an existing Area Superintendency, a Community Superintendent as the chief school officer for each Community District. Each Community Superintendent shall report to the Superintendent or his Deputy and shall also consult with and be advised regularly by a Community District Advisory Council. Such Councils are established by the section of this plan entitled "Citizen Participation, Monitoring and Reporting". Each Community District school facility shall, before July 1, 1976, be administered by an administrator at the rank of principal or headmaster. Selection of all administrators is subject to future orders of the court on the desegregation of administrators, as to which plaintiffs filed a comprehensive proposal and memorandum on May 7, 1975. Principals and headmasters in each Community District shall constitute an administrative cabinet to be known as the Council of Principals, which shall be chaired by the Community Superintendent.

Each Community District shall maintain a District Office that is located in a school facility within easy reach of all residents. The Office shall contain the Community Superintendent, a secretary for staff support of Community District Advisory Councils, and a professional staff charged with district-wide servicing of ancillary and support programs. The District Office shall also be the meeting place and facility for use by members of the Community District Advisory Council, the Council of Principals, and of Racial-Ethnic Parents' Councils.

### Curriculum and Grade Structure

Within the limits established by state standards, the policies of the School Department, and contractual obligations entered into with a paired college or university, each Community School District shall develop its curriculum and programs of instruction and extra-curricular activities in response to the needs and interests of the parents and students resident within the District, so that programs are non-discriminatory and inclusive of all ethnic groups. All extra-curricular activities and athletic programs shall be available and conducted on a desegregated basis. These responses shall be coherent from grade to grade and from school to school. Programs of instruction at all levels shall be planned to reinforce the quality of learning within the District High School. Each high school shall be a four year, comprehensive institution which serves with equal and uniform excellence of instruction, students seeking general culminating education, those seeking vocational training or experience, and those seeking preparation for post-secondary study. Each District High School shall also serve as an Adult or Multipurpose Community Education facility.

Community District school grade structures shall be uniform. Schools shall be 1–5 at the elementary level, 6–8 at the middle school level, and 9–12 at the high school level. They may enroll 13th graders. Most but not all elementary schools shall contain kindergartens. Kindergarten assignments shall be made by the School Department [1] to appropriate facilities, and may include interdistrict assignments. Kindergarten classes shall be desegregated wherever possible. If kindergarten students must be assigned to schools outside their home

1. The words "School Department" refer collectively and individually to the members of the Boston School Committee and Superintendent and their agents, servants, employees and attorneys and all other persons under their control.

neighborhoods, the assignments shall be made in accordance with two principles: (1) The resulting student bodies shall be desegregated, and (2) the burdens of distance and transportation shall be distributed equitably across ethnic groups.

### Bilingual Students

■ Schools where bilingual programs shall be provided are shown in the school tables which are part of this plan. Where 20 or more kindergarten students attend a school and are found to be in need of bilingual instruction, the School Department shall provide it. Parents who seek bilingual instruction for their children at any grade level shall note this on the enrollment application form which the School Department shall mail to them. However, the School Bilingual Department staff shall make the decision to *assign* students to programs, but not to specific schools within Community Districts. Bilingual program assignments will be the first made by the Assignment Unit.

### Special Needs Students

■ Every school facility shall receive and educate mild and moderate special needs students, who will be assigned to schools in accordance with regular assignment procedure by geocode. No less than one resource room and one special needs services space shall be set aside in each school. Each school shall have special educators and materials. Some moderate and severely handicapped students will be assigned directly to schools with special facilities and staff, apart from the geocode procedure. To support special education both in regular schools and in special resource schools, at least three such special schools in each community district shall be identified and planned by the School Department, for review by representatives of the court, not later than July 15, 1975. No special school shall consist wholly or primarily of special needs students.

### Capacities and School Closings

Every school facility shall house a student body that does not exceed the total capacity ceiling shown in the tables in the plan in order to avoid overcrowding and enable objective assignment by geocode units. The capacity ceiling makes no distinction between the variable seat requirements for kindergarten, special needs, bilingual, and vocational programs. This must be left to the planning discretion of the School Department. The ceiling capacity figure need not be met in any particular school, to enable this planning for program differences. The ceiling capacity limit is in no way prescriptive with respect to setting or influencing variable standards for establishing class size or teacher/student ratios.

The School Committee is ordered to close permanently the following schools [2], not later than August 30, 1975, in order to enable and maintain desegregation through the consolidation of student bodies: (Names of schools omitted).

### Maps, Tables, and Planning Specifications

The following maps show the boundaries, official names, and geocode units included within each of the eight Community School Districts. The base map was drawn some time ago and shows some schools now closed and others to be closed. A geocode is a bounded area of from five to fifteen residential blocks within a District and may contain anywhere from a half dozen to several hundred public school students. The geocodes were originally developed as reporting units for use by the Boston Police Department and are now used by the School Department for planning purposes. In this plan, they shall provide the basis for assigning students to schools.

---

2. The decisions to close these facilities were made after consideration of their locations in areas with excess seating capacity at the elementary level, of their conditions and presence on various lists of schools recommended for closing in the past, and of equity in the burden of school closings among districts and among ethnic groups.

One table accompanying the map of each Community School District lists the school facilities for the District, together with the limit on capacity for each facility, the designation of numbers of students to be accommodated in bilingual program clusters within particular schools, and, in the lower right hand corner, the total available seats at each level. A second table summarizes the population composition of students residing in the District who are enrolled in public schools as of April 10, 1975. The bottom line states the racial and ethnic compositon of the Community District to which the percentage variations permitted by the guidelines for assigning students relate. Following the tables is a summary of planning specifications for each District.

District 1 - Brighton-Mission Hill
District 2 - Jamaica Plain
District 3 - West Roxbury
District 4 - Hyde Park
District 5 - Dorchester
District 6 - South Boston
District 7 - Madison Park
District 8 - East Boston

254

BRIGHTON—MISSION HILL COMMUNITY SCHOOL
DISTRICT 1

COMPOSITION BY GEOCODES

283; 580-596; 599-632; 749-816; 820; 844-845; 848-850; 854

## TABLE 1.
### BRIGHTON-MISSION HILL COMMUNITY SCHOOL DISTRICT 1.

| School | Limit On Capacity | No. Bilingual Students | |
|--------|-------------------|------------------------|---|
| 1. Brighton High | 1200 | Chinese<br>Hisp. | 100<br>120 |
| 2. Edison Middle | 750 | Chinese<br>Hisp. | 60<br>100 |
| 3. Taft Middle | 850 | | |
| 4. Baldwin | 400 | | |
| 5. Barrett | 180 | | |
| 6. Farragut | 290 | Hisp. | 40 |
| 7. Gardner | 550 | Hisp. | 100 |
| 8. Garfield | 450 | | |
| 9. Hamilton | 380 | Chinese | 60 |
| 10. Lyon | 200 | | |
| 11. Oak Square | 130 | | |
| 12. Storrow | 100 | | |
| 13. McKinley | 130 | Hisp. | 40 |
| 14. Milmore | 190 | Hisp. | 40 |
| 15. Tobin | 630 | Hisp. | 100 |
| 16. Winship | 460 | Hisp. | 100 |

| | |
|---|---|
| High School Total | 1200 |
| Middle School Total | 1600 |
| Elementary School Total | 4090 |
| Totals | 6890 |

BRIGHTON—MISSION HILL DISTRICT 1 1974-75 STUDENT ENROLLMENTS[1]

| Grade Level | No. Students | | | | % | | |
| | White | Black | Other Minority | Total | W | B | OM |
|---|---|---|---|---|---|---|---|
| $K_1$ + $K_2$ | 572 | 234 | 289 | 1095 | 52 | 22 | 26 |
| 1 - 5 | 1345 | 1366 | 923 | 3634 | 37 | 38 | 25 |
| 6 - 8 | 789 | 641 | 388 | 1818 | 43 | 35 | 22 |
| 9 - 12 | 1188 | 677 | 410 | 2275 | 52 | 30 | 18 |
| 13 | 119 | 24 | 69 | 212 | 56 | 11 | 33 |
| K - 13 Total | 4013 | 2942 | 2079 | 9034 | 44 | 33 | 23 |

1. Data filed by School Department Data Processing Center and Educational Planning Center on April 10, 1975. Includes any student enrolled anywhere in Boston public schools, but residing in this District, and attending one or more days since September, 1974.

------◆------

PLANNING SPECIFICATIONS FOR BRIGHTON–MISSION COMMUNITY SCHOOL DISTRICT

1. Approximately one-half of the resident high school students will need Citywide high school admissions or assignments.

2. The McKinley School shall be converted to a general elementary school from its present exclusive use for trainable and educable retardates of middle and high school age. So that no hardship is created for McKinley's present students, however, this change shall be gradual and phased so that current students may complete the program. A plan for accomplishing this shall be filed with the Court representatives not later than August 1, 1975. The plan shall include identification of future facility provisions for retarded youths.

3. The Taft Elementary School shall be converted for use as part of the Taft Middle School.

4. Twenty-five percent of the seats in the Jackson portion of the Citywide Jackson-Mann School, in Hennigan School, Boston Trade High School and English High School shall be reserved for residents of this District.

(Maps, tables and planning for Community School Districts 2–8 have been omitted.)

B. THE CITYWIDE SCHOOL DISTRICT

*Definition and Purposes*

Citywide School District 9 shall comprise those schools offering distinctive programs of instruction that may serve the needs and interests of students residing anywhere within Boston. Citywide schools range from those offering admission by examination to those targeting their services at students eligible for Title I federal aid. District 9 shall be organized like the Community School District, with a Citywide Superintendent, a District office, a Council of Principals and a Community District Advisory Council.

The purposes served by the Citywide School District are identical to those

set forth for Community School Districts, with these additions: The Citywide District shall facilitate the establishment of a substantial sector of the school system within which complete desegregation with relatively slight deviations from systemwide racial ratios is accomplished on the basis of the magnetic attraction of the programs of instruction. These programs are intended to address a wide range of needs and interests and to respond to them educationally in ways that unify all groups within the city.

The provisions of the plan contained in the previous section dealing with Community District Schools, e. g., administration, curriculum, bilingual and special needs students and capacities, shall apply equally to District 9 schools except where inconsistent with particular provisions contained in this section, e. g., the six grade structure of Latin School and Latin Academy.

*Options and Applications*

 The School Department shall, under the court's supervision, prepare an "Orientation and Application Booklet." The booklet shall be printed for mailing in an English and Spanish version and in a Chinese version. The English-Spanish version shall be mailed to the parents or guardians of all students enrolled in the public schools. The Chinese version shall be mailed to the parents or guardians of students identified from enrollment lists as Oriental. Translations into French, Greek, Italian and Portuguese shall be printed for distribution and copies of the booklet in these languages as well as in English-Spanish and Chinese shall be made available at local schools, Community School District offices and at other municipal locations. A statement in each language shall appear in the English-Spanish booklet mailed to parents and students informing them of the availability and location of copies in these languages. The orientation section of the booklet shall present brief but cogent descriptions of all of the schools and their programs within Citywide District 9 and shall orient readers accurately to school resources and to the range of options and restrictions governing final assignments.

The enrollment application section shall instruct the parents or guardians of all prospective students under 18, as well as the student who is 18 or over, in how to apply for the schools and programs the student prefers. Prior to mailing the booklet, the School Department shall conduct an orientation program within the schools and through the media. The School Department shall conduct and encourage conferences and planning sessions between staff, parents, students, and civic leaders to explore and develop the full implications of magnet programs. After the booklets have been mailed, there shall be an information and guidance center located in each Community School District office to which parents and students may direct inquiries. The address and telephone number of each center shall be printed in the booklet.

The application portion shall include a request that is obligatory for responses as to student's age, ethnicity (white, black, Hispanic, Oriental, American Indian, or other); address of residence; last school and grade attended; special learning or treatment needs; Title I eligibility; home language; and other data the School Department deems essential for processing the applications. The application shall present parents and students with the following options[3]:

a. Preference for assignment to the Community School District schools with the specific school *not* named.

b. Preference for one or more specific Citywide District schools, or pro-

---

3. METCO, EDCO, or similar programs shall not be offered as options, but the booklet shall inform readers of the nature of such

programs and shall provide an opportunity for the parent or student to request further information about the programs.

grams within such a Citywide District school.

The application shall inform parents and students that all currently enrolled students (except current 12th and 13th graders) will be assigned to the extent possible on the basis of their preferences, but that if the application is not returned before the deadline for doing so or omits essential information, the student will be assigned to a school without having his or her preferences considered in the initial assignment process. The application should also state that students not currently enrolled who seek to enroll for the 1975–76 school year, who do not submit an application by the deadline for doing so will be permitted to express preferences but will have to be assigned on the basis of available seats. The booklet shall inform readers that citywide magnet preferences are not guaranteed, nor is assignment to a Community District school; and that the school to which each Community District student is admitted *cannot* be identified until notification is made in writing to the parent by the School Department.

The enrollment application shall be printed in such a manner as to be detachable and returnable by prepaid mail to the School Department. Students and parents shall be given ten days in which to study, complete and mail the Application. The School Department shall notify all applicants and currently enrolled students of their admission assignments in writing by mail not later than 21 days after the application's return deadline has expired.

The most crucial feature of this three-step procedure is the reservation to the School Department of the power to assign the applicant to a specific school and program in a school. As the Timetable of Performance, *infra*, makes plain, the analysis of applications and the assignment of pupils to schools and programs will be supervised by the court.

*Examination Schools*

Citywide schools range from the three examination schools with special entrance requirements, to the Title I eligible subsystem schools, to schools which have achieved distinction in offering unique programs at all levels. Some of the schools are now being erected, for use in 1976.

Boston Latin School and Bostin Latin Academy will continue for the school year 1975–76 to provide a six-grade program and to accept both 7th and 9th grade students. At least 35% of each of the entering classes at Boston Latin School, Boston Latin Academy and Boston Technical High in September 1975 shall be composed of black and Hispanic students. The School Department may utilize the scores of applicants on the SSAT, alone or combined with students' grade point averages or standings as criteria for admission. The School Department shall exercise its judgment in setting criteria such as a minimum SSAT score or relative weights to be given to scores and grades, so long as the criteria chosen result in entering 7th and 9th grade classes at least 35% black and Hispanic. These orders apply only to the 1975–76 school year and are subject to change both as to grade structure and admissions criteria, dependent upon an ongoing evaluation of racial data and of the effect of this admissions program upon the desegregation of the examination schools.

The School Department shall also institute and conduct programs (a) to make all students in the system aware of the admission requirements and type of instruction offered at the examination schools, and (b) to recruit black and Hispanic applicants to the examination schools in future years.

Any tutorial programs given to prepare students for entrance examinations shall be conducted on a desegregated basis, as shall advanced work classes (if they are to be continued). Any

enrichment and remedial programs for students admitted to or enrolled in the examination schools shall be available and conducted on a desegregated basis. There shall be no tracking of students within the examination schools which results in racially segregated classes.

*Institutional Support*

Institutions of higher education and culture, business corporations, labor unions and other organizations in the Greater Boston area have committed themselves to support, assist, and participate in the development of educational excellence within and among the public schools of Boston. These institutions shall not be asked or required to make grants of their funds, or to be responsible for administration. There is no wish or intention on the part of the court or of these institutions to usurp or replace the proper role of the School Department or any of its employees; their sole purpose is to benefit the public school children of the city.

The court has matched colleges and universities with particular high schools, both community and citywide, and with selected other schools and programs, in ways that fit the capabilities and needs of the partners. Other colleges and universities may be added as this Plan is implemented. In addition, businesses have been explicitly paired and associated with schools. The leadership of the Boston Trilateral Task Force, composed of business and other concerned institutions, has pledged itself to continue and enlarge this kind of support in order to supplement academic theory with business practicability.

Labor organizations have expressed a readiness to support and assist in occupational, vocational, technical; and trade education, and planning for some programs has already begun. The court will foster paired relationships in similar detail at a later stage in the planning. A committee of the Boston Bar Association has assisted the court in developing institutional support and will continue to do so.

The Metropolitan Cultural Alliance, a membership organization of 110 cultural institutions, has also renewed its commitment to continue its support and assistance to schools in the Citywide District as well as in several Community School Districts. The Alliance made a major contribution to the implementation of the state plan in 1974–75 by working with thousands of students and hundreds of teachers. This work will continue to expand and improve. Its major impact will be upon Citywide magnet programs.

The pairings listed below shall enable participating institutions of higher learning to share in the direction and development of curriculum and instruction under court-sanctioned contracts with the School Department. These contracts shall be unique to each institution and its matching school. They shall set forth the scope of authority of the parties and the role to be played by each in educational program planning, curriculum development, instruction, research, and the like. The city defendants shall use their best efforts to negotiate a contract pertaining to each school listed below acceptable to both the Boston School Committee and the contracting institution of higher learning. Good faith discussions and negotiations are already in progress between college and university representatives and School Department personnel, in cooperation with an Ad Hoc Committee of three attorneys appointed by the court on April 15, 1975. Jurisdiction is reserved to enter additional orders in this area should they become necessary.

Several of the colleges and universities are currently conducting programs, some of long standing, in various schools. The pairings listed below do not supplant programs either already in operation or planned independently of this plan. Also, some undertakings may overlap, e. g., a college may work in a high school located in a district where a different college has general responsibility. In order to promote understanding of the

roles of paired educational and business institutions, the Orientation and Application booklet shall include language substantially as follows:

"To assist the school department in its efforts to improve the quality of education in the Boston school system, many colleges, universities and businesses in the greater Boston area are collaborating with individual schools, most but not all at the high school level, in designing and implementing new programs of instruction and strengthening existing programs. Cooperation from the business community began last year in the form of a Tri-Lateral Task Force whereby particular companies were paired with particular schools. Other businesses have since volunteered to enter into "pairings" with schools, and labor organizations have also shown interest in helping.

"Along similar lines, beginning in April of this year colleges and universities have been paired with the schools listed below and collaborative efforts have begun toward making various planning and educational resources of area colleges and universities available to the particular schools listed, in the hope of formulating and implementing magnet type educational programs of the general description indicated. The process of planning and developing new educational programs is a complex and continuing one. It is impossible to predict what programs now in the planning stage will have been developed completely by the fall of this year. However, a great deal of effort is currently being expended in the hope that new programs may be ready for enrollment in the fall of this year or later during the 1975–76 school year. Furthermore, magnet-type programs which were in existence during the 1974–75 school year, which are also listed below, will continue and in some instances will have been expanded by the time schools open next fall."

There follows a list of the college and university pairings:

(Names of participating colleges and universities and schools with which they are linked omitted.)

The Tri-Lateral Task Force, made up of business leaders, has been working with the Boston School System since June of 1974 to improve the quality of education. This represents a substantial commitment of the talent, resources and experience of the Boston business community to the city's high schools. The pairing of businesses with high schools, similar to the pairing of institutions of higher learning, will establish a degree of responsibility and identification resulting in a genuine commitment to heightening the effectiveness of each school.

*Participating Business Organizations*

The list of businesses which have agreed to assume a responsibility for a specific school and the tentative pairing with high schools is as follows:
(Names of businesses and schools omitted.)

*Citywide Schools and Programs*

All Citywide schools except the English Language Center and the examination schools, shall reserve 25 percent of their seats for students residing in the Community District in which the school is located. There follows a listing of the schools that comprise the Citywide School District, together with the court's designation of the program of instruction to be featured in each. Program features were developed on the basis of descriptions provided by the School Department combined with modifications introduced by the court for the purpose of enhancing the desegregative power of the schools as magnets:

*High Schools*

1. *Boston High School.* Limit on capacity: 600. This school features work/study, or cooperative education. Its students must be employable, so that the close relationships established with businesses and other employers may be sustained. The academic program of the

school will constitute a comprehensive high school program commensurate with state requirements. The work program entails paid employment and coordinated supervision. Hispanic bilingual instruction shall be provided.

(Programs in 25 other Citywide schools and provisions for vocational education omitted.)

### D. GUIDELINES FOR AS-SIGNING STUDENTS

Assignments shall be made by a staff unit designated by the Superintendent, under the supervision of court representatives.

*Applications*

■ The parents of each prospective student, or the student if 18 or older, will be asked to indicate preferences among school assignments. At the elementary and middle school levels, parents should rank up to three preferences from among the citywide schools and a community district assignment. Assignment to a community district school is guaranteed at the elementary and middle school levels, for any student who prefers such an assignment or who indicates no preference. At the high school level, the parents or student should rank three preferences among the citywide high schools and a community district assignment. The admission process will attempt to honor these indicated preferences.

*Assignments to Community District Schools*

■ The basic unit for assignment shall be the geocode, i. e., except where specifically provided, all students shall be assigned to community district schools on the basis of the geocodes in which they reside. Geocodes may be divided into as many as three parts, but only where such a division aids in achieving the assignment goals. Each community district school shall have assigned to it geocodes that lie within the district, so that each school's racial and ethnic composition generally reflects the percentages of white, black and oth-

er minority students, kindergarten through grade 13, who reside in the district. Assignments of geocodes to schools should avoid, wherever feasible, dividing neighborhoods that are ethnically integrated, and should attempt to minimize the transportation of students.

■ Where necessary in order to fit students assigned by geocode units to seat capacities, to make allowance for geographical obstacles and transportation routes and to minimize mandatory busing, the composition of schools within a district may vary within ranges to be determined by computing the white, black and other minority shares of the District's student population and multiplying the resultant percentages by 25 percent. For example, white students residing in Brighton-Mission Hill District 1 make up 44 percent of the District's school population. Under this guideline the extent of permissible variation is determined by multiplying 44 by 25%; the extent of permissible variation thus is 11 percentage points. While the desired norm shall be 44 percent, the percent white students in District 1 community schools may, where necessary, range between 33 and 55 percent. The tolerances provided here, based on the size of each group, assure protection against disproportionate isolation for the smaller groups within each district, while providing the latitude to minimize mandatory busing and ease the matching of geocodes to school capacities, consistent with desegregation.

Exceptions to these variation limits shall be permitted where necessary to allow appropriate bilingual assignments or to allow students in any racial or ethnic group to be assigned to a particular school in groups of at least twenty. As a result, some schools may have no other-minority students in attendance.

Certain students will be assigned without the use of geocodes. Students in need of bilingual education or special education will be assigned individually to appropriate programs within the district of residence. High school students

entering their year of graduation in the fall of 1975 and students wishing to continue participation in a vocational program will, if they request, be assigned to the school attended in the previous year, even if that school lies outside the applicant's district of residence.[4]

### Admissions and Assignments to Citywide Schools

Admission and assignment of students to citywide schools shall be on an individual basis, not by geocode. They shall grant student preferences to the extent possible while at the same time achieving a racially desegregated student body, providing seats for high school students from districts with overcrowded community district high schools and assuring that the compositions of community district schools remain within the ranges set for those schools. Admissions and assignments shall be made under the supervision of representatives of the court, and will be reviewed by the court.

 Admissions and assignments shall be carried out so as to achieve racial and ethnic compositions at citywide schools closely reflecting the racial and ethnic composition of the school system as a whole. The white and combined black and other minority percentages at each citywide school shall be within five percentage points of the systemwide percentages (projected as 51% and 49% respectively for 1975–76), thus allowing a range of ten percentage points (56% to 46% white and 54% to 44% combined black and other minority for 1975–76). Other minority students may make up as much as but no more than 30% of admissions, and no minimum percentage will be required, but where possible black and other minority students will be admitted to each citywide school in proportion to the systemwide black and other minority percentages (37% black and 12% other minority for 1975–76).

These admission guidelines for citywide schools are subject to three exceptions: (a) Students entering their year of graduation in the fall of 1975 shall be assigned to the school attended in the previous year, if they elect that school as their first preference. (b) The Hernandez school, which contains a citywide Spanish-English bilingual program, may enroll a student body up to 65% Hispanic. Non-Hispanic other minority students will be eligible along with white and black students, within the remaining 35% of school capacity. (c) The examination schools are subject to independent desegregation requirements for the 1975–76 school year.

Citywide assignments shall be made in a manner that avoids carrying any community district school's composition beyond the variation limits for white and black students set in the section governing community district school assignments.

If a citywide school is oversubscribed, applicants shall be admitted in the following order of priority: applicants residing in the community district where the citywide school is located, up to 25% of the school's capacity; applicants who attended the school in the preceding year; high school students whose community district school is, or during the assignment process, remains oversubscribed; all other applicants.

Applicants shall be selected from among students in the same category of priority, on the basis of the preference rankings entered on their enrollment applications for the particular citywide school (e. g., a first preference for a particular school will outrank a second preference for the same school); further admission selections shall be made at random, except to the extent necessary to prevent overcrowding at the community district schools or departure in community district schools from the variation limits for white and black students set in the section governing community district school assignments.

If high school students do not elect to attend citywide high schools in num-

---

4. For the assignment of kindergarten students, see *ante*, p. 251.

bers sufficient to prevent overcrowding at community district high schools, high school students shall be assigned to citywide high schools to the extent necessary to prevent overcrowding at community district high schools, using the following method: from each racial or ethnic group of applicants for admission to an oversubscribed community district high school, students shall be selected at random for admission to the community district high school until the school is filled to the capacity set in this plan in accordance with the racial and ethnic percentages and permissible variation limits for that community district. Students not admitted to the community district high school to which they applied shall be assigned to citywide high schools, honoring preferences entered on enrollment applications where possible and in all other cases placing the student at the citywide high school opening nearest to his residence in keeping with the guidelines applicable to citywide schools generally.

A master list of all prospective enrollees shall provide the basic resource for implementing the assignment procedure. The list shall be developed by the School Department alphabetical list of students filed April 10, 1975 by the school committee, as revised by the addition of and supplemented by geocode designations and the reconciliation of data on the list with data obtained from the enrollment application forms.

*Transfers*

A student may transfer from one school to another with a suitable opening only when the transfer, whether intradistrict or interdistrict, would diminish racial imbalance, i. e., move the racial composition of the more racially imbalanced of the two schools closer to the systemwide racial composition. Transfers may also be made to provide students with appropriate bilingual or special education services and for purposes and under conditions authorized by the court in orders entered in these proceedings during the fall of 1974.

## E. TRANSPORTATION

Students are assigned to schools on the basis of community districts on the one hand and citywide magnet schools on the other. Within any Community District, the average distance from home to school will not exceed 2.5 miles, and the longest possible trip will be shorter than 5 miles. Bus travel times will average between 10 and 15 minutes each way, and the longest trip will be less than 25 minutes. Students bused at one school level such as 1 through 5, will be assigned to walk-in schools at the next level such as 6–8, wherever possible.

■ The court finds that an adequate remedy in this case must involve mandatory transportation of students. 20 U.S.C. § 1755. Mandatory transportation by chartered bus refers to the service that the School Department shall provide for students assigned to elementary schools which are more than 1 mile from home; for middle school students who live more than 1½ miles; and for students assigned to high schools who live more than 2 miles from the school. The reason for mandatory transportation may be distance, safety, or controlled transfer, or a combination of these. For high school students assigned to schools within ready reach of mass transit, the School Department may fulfill its obligation by providing for free use of buses and subways. Mandatory bus transportation will be required for approximately 21,000 students, as follows:

| Grades | Total Students | To Be Bused |
|--------|---------------|-------------|
| 1–5 | 33,773 | 12,000 |
| 6–8 | 17,106 | 5,000 |
| 9–12 | 21,370 | 4,000 |
| | 72,249 | 21,000 |

Because of the use of district boundaries, between one-third and one-half of students bused mandatorily will travel shorter distances than students totaling approximately 17,000 who are bused

mandatorily under the state plan currently in effect.

Assignment of every student to the school closest or next closest to his residence, considering only school capacity, natural physical barriers or both, along with grade level and the type of education provided, cannot achieve substantial desegregation in Boston due to the geography of the city and racial and ethnic distribution in the city. 20 U.S.C. § 1713(a), (b), § 1714. Revision of attendance zones and grade structures, construction of new schools and the closing of old schools, a controlled transfer policy with limited exceptions and the creation of magnet schools have been used in the formulation of the plan here adopted in order to minimize mandatory transportation. 20 U.S.C. § 1713. The court finds, however, that some transportation of students to schools other than those next closest to their residences is required to remedy adequately the denial of plaintiffs' constitutional rights and to eliminate the vestiges of a dual school system in Boston. 20 U.S.C. § 1702(b), § 1714(a). The court has required no transportation, however, that would pose a risk to the health of students or impinge on the educational process for those students due to excessive time or distance travelled. 20 U.S.C. § 1714(b).

The School Department shall prepare a transportation plan and file it on or before July 7, 1975 for review by and approval of the court. After notice the court will hear the parties on the question whether a consultant in modern transportation engineering should be appointed to assist and supervise preparation of a transportation plan providing the safest, shortest and cheapest routes and stops for every District.

## F. COST CONSIDERATIONS

The plan will require the use of approximately 420 buses, if planned transportation routes develop like those used in 1974–75. On these assumptions the busing costs, computed at $100 per bus per day, would total approximately $7.6 million per year. More precise route and stop planning might reduce this by $1 million per year. Virtually all of the costs of mandated transportation under this plan are fundable by the State Board of Education. Such costs will amount to less than 7 percent of the school committee's annual budget, and in this respect are well within the national average school district outlays for transportation.

The plan allows completion of those projected and ongoing school facility construction projects which are noted in the section on school closings and in the sections containing planning specifications. Proposals for other facility replacements shall be filed by the Public Facilities Department or the School Committee for court review, and will be approved where they are necessary for health and safety reasons or for desegregation.

The plan orders that 13 schools which are open this year and 11 now unused be closed permanently. Savings in fuel and maintenance expenditures will be realized from these closings. Efficient utilization of space will be possible in an estimated 70 elementary schools which are now fully heated and maintained, but under-enrolled.

The plan has as a goal voluntary desegregation through the Citywide District schools and the application process for registering program preferences. Roughly one-fourth of all students may be located in schools by parental option. This may enable safety and enforcement expenditures to be reduced from those incurred during 1974–75.

The plan requires new expenditures for a Citywide Education Council, Community District Advisory Councils, District office staff and equipment, and for increased numbers of school administrators. Staffing can be achieved from within the existing complement of personnel, and through normal methods of replacing resigning and retiring personnel. Staff development costs for the

plan will include outlays for minority recruitment and hiring previously ordered, and staff training in human relations and for new assignments in changing programs.

By obtaining institutional support through school pairings, savings in support and assistance costs may be realized and new external revenues generated. these institutions may serve as fiscal agents for research, teacher training, curriculum, and program development grants and contracts.

The treatment in the plan of special needs students conforms with state law and enables the Boston public schools to qualify for federal and state aid for special education.

With the implementation of the plan, the Boston public school system may attract more funding from public sources and from increased numbers of private sources.

## G. CITIZEN PARTICIPATION, MONITORING AND REPORTING

### Citywide Coordinating Council

#### Membership

A Citywide Coordinating Council (CCC) will be established having approximately 40 members appointed by the court. The membership will include members of the white, black, Hispanic and Asian ethnic groups, parents from all sections of the city and persons from educational, business, labor, civic, religious and community organizations. Two members of the Citywide Parents' Advisory Council (CPAC) will be members of the CCC, as will two students to be selected from Racial-Ethnic Student Councils. Most, but not all, CCC members will be residents of Boston; all will be persons deeply concerned with the welfare of the city and its school system. Diversity of views regarding school desegregation will be sought consistent with willingness to support the responsibilities of the council. Members of the CCC will be appointed to serve through June of 1976. The court will appoint an interim CCC chairperson and subcommittee chairpersons for a period of 60 days, during which time the CCC shall hold elections for these positions.

#### Purposes

The CCC will foster public awareness of and involvement in the process of implementation of the court's desegregation orders. It will be the primary body monitoring implementation on behalf of the court. It will in this connection file monthly reports with the parties and the court covering its activities. It will attempt to avoid the difficulties caused by lack of preparation and community education associated with the state plan currently in effect. It will work to develop the cooperative efforts of universities and colleges, cultural institutions and business and labor organizations with the Boston schools. The CCC will attempt to identify and resolve problems by mediation and conciliation. In its actions, it will act with awareness of the needs of non-English speaking groups and communities in the city. It may bring unresolved problems to the attention of the parties, the court or other appropriate persons. It may communicate and publicize its views and recommendations to the public, the parties and the court. The CCC will not co-manage or make policy for the Boston schools. Neither will it assume the responsibility of the Boston school committee and superintendent and other defendants to carry out the court's orders.

#### Organization

Separate subcommittees of the CCC will deal with each of the following areas:

(1) *Public information*—the provision of accurate and adequate information concerning all aspects of the desegregation plan and process.

(2) *Monitoring*—assuring compliance by all parties with the court's desegregation orders and monitoring of other

aspects of the desegregation process [5] through the administration and extension of the present monitoring program established by the Community Relations Service.

(3) *Community Liaison*—exchange of information and assistance between the CCC and business, civic, neighborhood, religious and academic groups and agencies; coordination of efforts and stimulation of new efforts from these groups when and where needed.

(4) *District Council Liaison*—development of a plan for formation and operation of Community District Advisory Councils; liaison with local councils when established.

(5) *Education Programs*—support of efforts to improve quality education; addressing problems in the desegregated provision and accessibility of various programs, including bilingual, special needs, magnet school and vocational programs; liaison with universities, colleges, cultural, business and labor groups involved in mutual assistance arrangements with the school committee and department.

(6) *Public Safety and Transportation* —monitoring of the development and implementation of safety and security procedures and of human relations programs and other training in connection with desegregation.

(7) *An executive committee* composed of the CCC chairperson, the subcommittee chairpersons and one member of the Citywide Parents' Advisory Council will conduct CCC business between meetings of the full council, receive subcommittee reports and recommendations and authorize and approve subcommittee activities. It will formulate bylaws and establish quorums and other procedural rules for the CCC and the subcommittees. The bylaws may provide for cochairpersons or vicechairpersons of the CCC and its subcommittees and for their immediate election, in which event they shall assume office immediately and share responsibility with the interim chairpersons appointed by the court to serve for 60 days. A member of the Community Relations Service of the Department of Justice shall be permitted to attend and participate in meetings of the executive committee in a non-voting capacity.

The Boston school committee and superintendent shall meet with the executive committee of the CCC at least once each month in open session to discuss progress in implementation of the plan and resolution of problems identified by the CCC. The school committee shall provide the CCC with copies of agendas' and minutes of all school committee meetings.

*Meetings*

The CCC will meet at least once each month and the subcommittees at least twice each month. The agenda for CCC meetings shall be prepared and publicized in advance. The CCC will act in open session and any written reports to the court will be public. The Community Relations Service of the Department of Justice will provide technical assistance to the CCC and a member of the Service shall be permitted to attend and participate in meetings of the CCC and its subcommittees in a non-voting capacity.

*Powers and Authority*

The CCC will be the monitoring body for the court. The CCC shall have the power to discharge its responsibilities adequately, including the authority to hold public meetings, conduct hearings, make written reports and make inspections of school facilities. The parties shall cooperate fully with the CCC and provide its members with reasonable access to information required for its work. The CCC may submit recom-

---

5. Such aspects, which may not be covered by specific court order, may include school committee policies, administration and staffing, curriculum and instruction, discipline, transfer procedures, police-school relations, budgeting and allocation of resources and teacher and student human relations training.

mendations and reports to the court and shall file monthly reports with the court beginning July 1, 1975.

The CCC shall have staff assistance including a staff director and necessary secretarial and clerical personnel, all of whom it will select, appoint and fix compensation for, subject to court approval. It will have permanent office space not associated with any party or the court. Salaries and other expenses of the CCC, including expenses of the monitoring program which have been approved by the court, shall be paid by the city defendants.

### Community District Advisory Councils

A community district advisory council will be established in each district, including citywide school district 9, no later than one month after the opening of school in the fall of 1975. (The citywide district's advisory council is included in all references to community district advisory councils.) Each district council shall include 10 parent representatives who shall be elected at a meeting of the Racial-Ethnic Parents' Councils of all the schools in that district from among their members; two student members will be elected by the Racial-Ethnic Student council members of the district's schools from their membership.[6] A district council may contain no more than 20 members including representatives of teachers, police, school department administration, business, university, labor or community groups. The CCC will nominate such representatives as reflect the composition of the school population and needs of the district for appointment by the court to complete each district council. Each district council will develop as soon as possible, preferably within two weeks of its establishment, by-laws concerning quorums and meeting procedures. District council members shall elect a chair-

person from its membership to preside at council meetings, which shall be held at least once each month. Meetings may be held in the office established for each district by the school department. There shall be a secretary located in that office who will work for the council. Vacancies in elected membership will be filled by elected alternates; vacancies in appointed positions will be filled by the court from nominations of the district council endorsed by the CCC. The district councils will act as an advisory group to district school department personnel and will monitor implementation of the plan on the district level. Reports of CCC monitoring will be sent to the appropriate district council. Unresolved matters may be brought by district councils to the CCC, which will supply assistance and supervision to the district councils. Reasonable access to information shall be given to district councils by the parties.

### Racial-Ethnic Parent Councils

The establishment and operation of Racial-Ethnic Parent Councils (RPCs) in each school, as set out in the court's order of October 4, 1974 and amendments thereto, shall continue. Additional schools which in 1975 meet the criteria for establishment of RPCs shall elect RPCs. The RPCs will continue to provide mechanisms for concerned parents to address racial problems in their children's schools. Their role will be expanded to include electing parent representatives and alternates to the community district advisory councils.

The Citywide Parents' Advisory Council (CPAC) similarly will continue to provide support and communication to the local RPCs. It will be increased in size according to the number of districts established by the court's plan, so as to continue to be composed of two members from each district, and will also contain two Hispanic and two Asian-American parent representatives to be

---

6. Schools where in the fall of 1975 the criteria for establishment of Racial-Ethnic Parent and Student Councils are not met may elect representatives to vote with Racial-Ethnic Council members in selecting district council members.

elected by citywide caucuses of parents and guardians of Hispanic and Asian-American students. The CPAC will elect two of its members to the CCC, one of whom will serve on its executive committee, and the CPAC will work especially closely with the community liaison subcommittee of the CCC. The CPAC will remain the body exclusively composed of parents concerned with resolution of racial problems within the schools.

### Reports

Appropriate school personnel shall participate with Community District Advisory Councils and with school Racial-Ethnic Parent Councils in developing during the course of the school year an annual report of progress covering that school. The Superintendent shall file with the court on or before February 1, 1976 a report stating the procedures instituted, responsibilities delegated and forms devised for the purpose of compiling information to be contained in the annual reports. These individual school reports shall be analyzed and consolidated by the District Superintendent in each community school district and in the citywide school district, with the assistance and participation of the Community District Advisory Council. The Superintendent shall file with the court annually on or before July 15 a report covering the entire system for the previous school year. Copies shall also be sent to the CCC and shall be available to the parties and to interested citizens.

The report shall contain racial and ethnic data and other information on each school, each district, and systemwide covering:

1. The number and percentage of students in each racial or ethnic category by grade in each school, and by grade level in each district and systemwide.

2. The number and percentage of faculty in each racial or ethnic category by grade (or subject taught) in each school, and by grade level in each district and systemwide.

3. The number and percentage, in each racial or ethnic category, of other staff within each job classification, including transitional aides, bus monitors, attendance supervisors and custodial staff, at each school, in each district, and in the system as a whole.

4. The length of experience of faculty and numbers of faculty with permanent or provisional status at each school, and by grade level in each district and in the system as a whole.

5. The number and percentage, in each racial or ethnic category, of administrators within each job classification, at each school, in each district, and in the system as a whole.

6. The number of students suspended and the length of their suspensions, and the number expelled, in each racial or ethnic category, by month of suspension or expulsion.

7. In each racial or ethnic category, by number of days absent (reasonably classified), the number of absentee students, and the percentage of all students in that racial or ethnic category that this number constitutes, at each school, and by grade level for each district and systemwide.

8. Student achievement information, e. g., results of reading tests, showing the number and percentage of students within each racial or ethnic category for each school and, by grade level, for each district and systemwide.

9. The number and percentage, in each racial or ethnic category, of student transfers requested and of transfers granted, by ground for transfer, e. g., desegregative, medical necessity, etc.

10. The number and percentage of students, in each racial or ethnic category, enrolled in special programs including bilingual education, vocational programs, special education (showing the number and percentage taught in separate classrooms and the number and percentage otherwise taught), advanced work classes and others, at each school and, by grade level, in each district and systemwide.

11. The adequacy of facilities, the conversion or repairs made on facilities.

12. Plans for new schools or additions or expansions of existing facilities with projected enrollment data by race or ethnicity and a statement of how such plans will affect desegregation.

13. Plans for improvements in school facilities, staff, supplies and programs.

14. Staff training and human relations training provided to staff and students, with details as to numbers of participants, nature and length of programs.

15. The number and percentage of students manditorily transported to school, by grade and by race or ethnicity, the minimum and maximum distances travelled and minimum and maximum times of trip, the average distance and time travelled, for each school and district and systemwide totals for elementary, middle and high schools.

16. Citizen participation and involvement, including summaries of activities of Racial-Ethnic Councils, Community District Advisory Councils and Citywide Coordinating Council; use by community of school facilities.

17. Particular programs involving colleges and universities, business and labor groups and cultural institutions and types of programs conducted and numbers and percentages of students participating, by grade and race or ethnicity.

18. Budgets for areas of major expenditures during school year just ended and school year about to begin.

The report may also include other information which the Superintendent believes would be helpful or informative.

## H. TIMETABLE FOR IMPLEMENTATION

The defendants, their officers, agents, servants, employees and attorneys shall take all actions necessary to accomplish the steps set out below on or before the dates listed; where filings with the court are ordered, copies shall be served on the parties and the court-appointed experts.

| | |
|---|---|
| May 19 | File print-ready copy of the Orientation and Application Booklet for parents and students. |
| May 20 | Hold seminars on the plan for principals, guidance counselors and others. |
| May 27 | Mail approved booklet to parents and guardians and students, stating a deadline for returning applications of June 6, 1975. |
| May 30–31 | Hold explanatory and orientation sessions for parents, students and teachers in every District. |
| June 6–19 | Review applications and prepare student assignments. |
| June 20 | File proposed assignments, enrollment totals and racial compositions of each school. |
| June 25 | Mail approved notices of assignment to parents, guardians and students. |

June 25–27 Plan student and parent orientation meetings to be conducted toward end of summer.

June 30 Complete faculty and staff assignments.

July 7 File transportation plan.

July 14 Notify parents, guardians and students of transportation provisions.

July 15 File report on job descriptions, hiring procedures and orientation and training plans for bus monitors, transitional aides and other staff; and report on development of contractual arrangements with colleges and universities.

July 30 File safety and police utilization plans which shall be drafted as soon as possible in consultation with other governmental agencies; report on facilities preparations; and report on planning and arranging a two-week period of staff planning for operation of this desegregation plan which shall be the ten week days immediately prior to the opening of the schools in the fall of 1975.

The city defendants may, on or before May 19, 1975 propose alternate dates for the steps listed above and propose additional steps they believe to be essential, with suggested deadlines.

The school department shall develop and file, on or before May 23, 1975, a detailed plan of activities, responsibilities, and internal scheduling for the implementation of the plan ordered by the court in the available time period, similar to that filed as section VII of the plan filed by the school committee on January 27, 1975. (Further remedial orders, provisions for retention of jurisdiction and appendices are omitted.)